IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ERNEST MATTISON,

      Plaintiff,     Civil Action No.
               9:16-CV-0015 (BKS/DEP)

  v.

JONATHAN ST. LOUIS and LIAM
MAHONEY[1],

      Defendants.

_____

APPEARANCES:      OF COUNSEL:

FOR PLAINTIFF:

ERNEST MATTISON, *Pro Se*
09-A-3287
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN   MATTHEW P. REED, ESQ.
New York State Attorney General   Assistant Attorney General
The Capitol
Albany, NY 12224

_____

1  Although sued only as Corrections Officers Saint Louis and Mahoney, affidavits given by defendants in support of their pending summary judgment motion reveal their identities as Jonathan St. Louis and Liam Mahoney. Dkt. Nos. 50-4, 50-5. The clerk is respectfully directed to adjust court records to reflect this new information.

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>ORDER, REPORT, AND RECOMMENDATION</u>

*Pro se* plaintiff Ernest Mattison, a New York State prison inmate, has commenced this action pursuant 42 U.S.C. § 1983, claiming that his civil rights were violated by employees of the New York State Department of Corrections and Community Supervision ("DOCCS"). In the claims that remain in the action, following initial review of his complaint, plaintiff alleges that the defendants, two corrections officers assigned to the facility in which he was housed at the relevant times, denied him access to showers for the period between August 19, 2015 to October 7, 2015, in violation of his rights under the Eighth Amendment.

Currently pending before the court is a motion filed by the two remaining defendants seeking the entry of summary judgment dismissing plaintiff's remaining clams both on the merits and based upon qualified immunity. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    <u>BACKGROUND</u>[2]

Plaintiff is a prison inmate currently being held in the custody of the

DOCCS. *See generally* Dkt No. 1. In May 2015, plaintiff was transferred

into the Clinton Correctional Facility ("Clinton"), located in Dannemora,

---

[2]     Although plaintiff filed an opposition to defendants' pending motion, he failed to specifically respond to defendants' Local Rule 7.1(a)(3) Statement of Material Facts. *See* Dkt. No. 50-1. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely a non-moving party's failure to properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).

Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). That deference, however, does not extend to relieving *pro se* plaintiffs of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., adopting report and recommendation by Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Plaintiff was specifically warned of the consequences of failing to properly respond to defendants' Local Rule 7.1 Statement, Dkt. No. 51 at 2. Despite that pointed warning, he nonetheless failed in his opposition papers to address defendants' Local Rule 7.1(a)(3) Statement, instead responding to certain statements contained in defendants' declarations. *See generally* Dkt. Nos. 53-1, 53-3, 53-4. I note that upon review of plaintiff's statements regarding defendants' declarations, I find nothing to demonstrate the existence of genuine issues of triable material fact precluding the entry of summary judgment and casting doubt on the facts set forth in defendants' Local Rule 7.1(a)(3) Statement.

As a result, I will deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

New York, where the events giving rise to his claims are alleged to have occurred. *Id.*; Dkt. No. 50-3 at 15-18. At all relevant times, defendants Jonathan St. Louis and Liam Mahoney were corrections officers assigned to plaintiff's cell block. Dkt. No. 50-4 at 1-2; Dkt. No. 50-5 at 1.

Plaintiff describes himself as a "special needs inmate." Dkt. No. 1 at 3. At various times, both prior to his transfer into Clinton and while at that facility, plaintiff received permits allowing him to use the "block shower," which is a single, private shower located within the cell block. *Id.* at 3; Dkt. No. 50-4 at 2-3; Dkt. No. 50-5 at 2. The majority of the inmate population uses regular showers, which are located in the bath house, the recreation yard, and the facility's gym, and all of which are within a five minute walk from the cell block. Dkt. No. 50-4 at 2; Dkt. No. 50-1 at 3. Block showers are reserved for inmates who are either serving a disciplinary sentence that restricts them to a cell block, or who have a proper permit. Dkt. No. 50-4 at 2-3; Dkt. No. 50-5 at 2.

Corrections officers have no authority to allow an inmate to use the block shower in the absence of a valid permit. Dkt. No. 50-4 at 3; Dkt. No. 50-5 at 2. To obtain a valid block shower permit, an inmate must secure a signed recommendation from medical staff, which then must be approved by the facility's security captain or a higher ranking official. Dkt. No. 50-5 at

3; Dkt. No. 50-4 at 3; *see also* Dkt. No. 1-1 at 3, 5. Such a permit is valid for only three months, and does not automatically renew. Dkt. No. 50-3 at 156.

Plaintiff held a valid block shower permit prior to August 19, 2015, and after October 7, 2017. Dkt. No. 1 at 3; Dkt. No. 1-1 at 3, 5; Dkt. No. 50-3 at 64. He did not, however, possess a valid block shower permit for the period from August 19, 2015 to October 7, 2015. Dkt. No. 1 at 3; Dkt. No. 1-1 at 3, 5.

Plaintiff's first block shower permit at Clinton expired on August 19, 2015. Dkt. No. 1-1 at 5. Plaintiff was generally aware of the process required to renew the block shower permit. Dkt. No. 50-3 at 64, 151. Although plaintiff was evaluated by medical staff in the days leading up to the expiration of his first block shower permit at Clinton, the medical staff did not recommend that it be renewed. Dkt. No. 50-3 at 69, 153, 181. Plaintiff attempted to secure the requisite medical evaluation on August 26, 2015, but his appointment for that day was cancelled due to provider unavailability. Dkt. No. 50-3 at 149, 151, 164. Plaintiff thereafter requested medical appointments for various reasons, including for renewal of his block shower permit, on September 2, 2015, September 15, 2015, and

September 29, 2015.[3] Dkt. No. 50-3 at 171. Ultimately, plaintiff was re-evaluated on September 29, 2015, and was issued a new, valid block shower permit, effective October 7, 2015. Dkt. No. 1-1 at 3; Dkt. No. 50-3 at 78, 149, 151.

Because plaintiff lacked a valid block shower permit for the period from August 19, 2015 to October 7, 2015, defendants refused to allow him to access and use the block shower. Dkt. No. 1 at 3; Dkt. No. 50-1 at 2-3. According to defendants, they lacked the requisite authority to allow plaintiff to access the block shower in the absence of a valid permit. Dkt. No. 5-4 at 3; Dkt. No. 5-5 at 2. At no time between August 19, 2015 and October 7, 2015 did defendants prevent plaintiff from taking a shower at the bath house, recreation yard, or gym. Dkt. No. 50-1 at 4; *see also* Dkt. No. 50-3 at 108.

Plaintiff testified that defendants and other correction officers would tell him to "[g]o to the [recreation] yard like everybody else" and "[g]o to shower in the gym like everybody else." Dkt. No. 50-3 at 63. However, plaintiff refused to use the regular showers because he considered them "degrading and humiliating," he had difficulty ambulating, and had limited

---

3    There is no evidence in the record to suggest that the defendants were in any way responsible for plaintiff's inability to schedule the requested medical evaluation.

use of one of his hands.[4] Dkt. No. 50-3 at 34, 108-109; Dkt. No. 53-5 at 3.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action by filing a complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") on or about June 6, 2016. Dkt. Nos. 1, 2, 8. Named as defendants in plaintiff's complaint were Corrections Officers St. Louis and Mahoney; a C. Gregory, whose position is not disclosed; Steven Racette, the former Superintendent at Clinton; and Michael Kirkpatrick, who appears to have succeeded Racette as the superintendent at the facility. Dkt. No. 50-1. Plaintiff alleges that because he was prohibited by defendants from accessing the block shower, he was caused to smell foul, live in unhygienic conditions, and be mentally depressed. Dkt. No 1 at 3. He seeks compensatory damages in the amount of $150,000, and punitive damages in the further amount of $150,000. *Id.* at 6.

Following an initial review of plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A, District Judge Brenda K. Sannes issued a decision and order on May 10, 2016, in which, she *inter alia*, granted

---

4    Plaintiff is not an amputee, and was not confined to a wheelchair at any time between August 19, 2015 and October 7, 2015. Dkt. No. 50-1 at 3; *see also* Dkt. No. 50-3 at 106. During that period, plaintiff walked to the recreation yard on more than one occasion to use the telephone. Dkt. No. 50-1 at 3; *see also* Dkt. No. 50-3 at 106-08.

plaintiff's IFP application, dismissed plaintiff's claims against defendants Gregory, Racette, and Kirkpatrick, and required the remaining defendants to respond to plaintiff's complaint. Dkt. No. 10.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's remaining claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 50. In their motion, defendants argue that dismissal is appropriate because plaintiff was not denied access to regular showers, and consequently they did not intentionally disregard a risk to plaintiff's health or safety. In the alternative, defendants further contend that they are entitled to qualified immunity. *See generally* Dkt. No. 50-2.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the

non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.   Eighth Amendment Conditions Claim

Plaintiff alleges that his Eighth Amendment rights were violated by defendants when they denied him access to the block shower during the period between August 19, 2015 through October 7, 2015. Dkt. No. 1 at 3. Defendants argue that there is no disputed issue of fact and that the conditions of plaintiff's confinement were not objectively serious because plaintiff had access to regular showers at the facility during the relevant time period, and that their denial of plaintiff's request for access to the block shower was due to his failure to obtain and present a valid permit permitting him to access the block shower. Dkt. No. 50-2 at 6-11.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a

maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and a subjective requirement. *Walker*, 717 F.3d at 125; *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.' " *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)); *see also Walker*, 717 F.3d at 125 ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."). In a prison setting, basic needs include "food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125 (citing, inter alia, *Rhodes*, 452 U.S. at

347).

As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly*, 76 F.3d at 480 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); see also *Walker*, 717 F.3d at 125; *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.).[5] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; see also *Walker*, 717 F.3d at 125; *Waldo*, 1998 WL 713809, at *2.

In this instance, plaintiff frames his Eighth Amendment claim as one involving the complete deprivation of his access to showers. *See* Dkt. No. 1 at 3-4. The undisputed record evidence, however, fails to support this allegation. During the fifty-day period that plaintiff did not have a valid block shower permit, he had regular, unobstructed access to regular showers at the facility. It was plaintiff's choice not to avail himself of the

---

5      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

regular showers because he felt they were "degrading and humiliating." The mere fact that the inmate may be embarrassed in a regular shower fails to rise to a level that would allow a reasonable jury to find that there was an unquestioned and serious deprivation of basic human needs or that the conditions, either alone or in combination, posed an unreasonable risk of serious damage to his health. *Cf. Duamutef v. Leonardo*, No. 91-CV-1100, 1993 WL 428509, at *13 (N.D.N.Y. Oct. 22, 1993) (concluding that an inmate's allegation that the strip frisks caused him to "suffer constant humiliation, unnecessary psychological pain and distress" did not rise to an Eighth Amendment violation). Moreover, although plaintiff contends that he has difficulty ambulating and limited use of one of his hands, he testified that he would nevertheless walk to the recreation yard, an area that had regular showers, up to four times per week. Dkt. No. 50-3 at 105-108.

In addition, despite being aware of the proper procedure to renew his block shower permit, which included a timely medical evaluation and approval by a security captain, plaintiff allowed his block shower permit to lapse. Plaintiff did not obtain the proper medical evaluation until September 29, 2015, which resulted in the issuance of a proper block shower permit on October 7, 2015. Dkt. No. 50-3. Accordingly, there is no

evidence from which a reasonable factfinder could conclude that the conditions of plaintiff's confinement resulted in unquestioned and serious deprivations of basic human needs when he was not permitted to use the block shower from August 19, 2015 to October 7, 2015.

Even if the court were to find that plaintiff's claim satisfied the objective element of a conditions of confinement claim, it would still fail because there is no evidence that defendants subjectively acted with deliberate disregard to plaintiff's health and safety when they refused to allow plaintiff access to the block shower. Defendants, who have no independent recollection of plaintiff's circumstances, denied that they interfered with any inmate's ability to take a block shower when presented with a valid permit. Dkt. No. 50-4 at 4; Dkt. No. 50-5 at 3. It should be noted, moreover, that plaintiff conceded neither of the defendants prevented his access to the regular showers. Dkt. No. 50-3 at 108. Moreover, when focusing on the subjective element of the Eighth Amendment analysis, it would be unrealistic to presume that a corrections officer would know that the denial of a block shower, in the absence of a valid permit and when access to regular showers is unobstructed, represented an excessive risk to inmate health or safety.

In sum, I conclude that no reasonable factfinder could determine that

plaintiff has met either the subjective or objective element of the Eighth Amendment test. Accordingly, I recommend that the court grant defendants' motion for summary judgment with respect to plaintiff's remaining Eighth Amendment conditions of confinement claim.

C.   Qualified Immunity

In addition to their contention that the court should grant them summary judgment on the merits, defendants further contend that they are entitled to qualified immunity from suit. Dkt. No. 50-2 at 9-10. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001),

15

*abrogated on other grounds by Pearson*, 555 U.S. 223)). Because

qualified immunity is "an immunity from suit rather than a mere defense to

liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court

has "repeatedly . . . stressed the importance of resolving immunity

questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S.

at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from

suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d

Cir. 2011). Specifically, the inquiry turns on whether the facts alleged,

taken in a light most favorable to the plaintiff, show that the conduct at

issue violated a statutory or constitutional right, and if so, whether that

right "was clearly established at the time of the challenged conduct."

*Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 566

U.S. at 664). The Supreme Court has said that an officer's "conduct

violates clearly established law when, at the time of the challenged

conduct, the contours of a right are sufficiently clear that every reasonable

official would have understood that what he is doing violates that right."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation marks and

alterations omitted). "To this end, a plaintiff need not show a case 'directly

on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230

(quoting *al-Kidd*, 563 U.S. at 741). However, "[e]ven where the law is

'clearly established' and the scope of an official's permissible conduct is

'clearly defined,' the qualified immunity defense also protects an official if it

was 'objectively reasonable' for him at the time of the challenged action to

believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70

(2d Cir. 2007) (citations omitted). This "objective reasonableness" part of

the test is satisfied if "officers of reasonable competence could disagree

on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335,

341 (1986).

As was noted above, "[a] clearly established right is one that is

'sufficiently clear that every reasonable official would have understood that

what he is doing violates that right.' " *Mullenix v. Luna*, 136 S. Ct. 305, 308

(2015) (quoting *Reichle*, 566 U.S. at 664); *accord, al-Kidd*, 563 U.S. at

741. The Supreme Court has recently "reiterate[d] the longstanding

principle that clearly established law should not be defined at a high level

of generality, . . . but must be particularized to the facts of the case." *White

v. Pauly*, 137 S. Ct. 548, 551 (2017) (quotation marks and citations

omitted); *see also Mullenix*, 136 S. Ct. at 308.

Undeniably, inmates have a clearly established right to sanitary

living conditions and the ability to maintain adequate personal hygiene.
*Walker*, 717 F.3d at 127 (citing cases for the proposition that "the failure to
provide prisoners with toiletries and other hygienic materials may rise to
the level of a constitutional violation"); *Treat v. Cent. NY Psychiatric Ctr.*,
No. 9:12-CV-602, 2013 WL 6169746, at *2 (N.D.N.Y. Nov. 20, 2013)
("[p]ersons in custody are entitled to '[r]easonably adequate sanitation and
the ability to eliminate and dispose of one's bodily wastes.' "). However,
"[n]owhere has it been held that prisoners are entitled to complete and
unfettered access to water or showers." *Beckford v. Portuondo*, 151
F.Supp.2d 204, 210 (N.D.N.Y. 2001) (Kahn, J.).

In this instance, while the ability to maintain adequate personal
hygiene was clearly established at the relevant times, after carefully
considering the record in a light most favorable to plaintiff, I conclude the
same cannot be said for the more limited issue of access to a block
shower. Even assuming that the right to a block shower was clearly
established, I find that a reasonable corrections officer in defendants'
position would have believed that his actions were lawful, particularly
where, as here, plaintiff had access to the regular showers, and the
officers lacked authority to allow plaintiff to utilize the block shower without
a permit, which he did not possess. Accordingly, I recommend that

defendants be afforded qualified immunity from suit as an alternative ground for granting defendants' motion.

IV.   SUMMARY AND RECOMMENDATION

The sole remaining claim in this action is premised on the allegation that plaintiff was denied access to showers for a period of approximately fifty days by defendants. The undisputed evidence, however, reveals that plaintiff was provided with unfettered access to regular showers at the facilty during that same time period. In light of the absence of any record evidence from which a reasonable factfinder could conclude that plaintiff's Eighth Amendment rights were violated, I recommend that defendants' motion for summary judgment be granted both on the merits, and on the basis of qualified immunity.

Accordingly, it is hereby

ORDERED, that the clerk respectfully be directed to adjust the court's records to reflect the defendants' names as Jonathan St. Louis and Liam Mahoney, and it is further respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and that plaintiff's remaining claims in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.[6]

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:    January 8, 2018
          Syracuse, New York

---

6    If you are proceeding *pro se* and are served with this order, report, and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order, report, and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

*4 Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:16-cv-00015-BKS-DEP   Document 60   Filed 01/08/18   Page 26 of 68

Duamutef v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

KeyCite Yellow Flag - Negative Treatment

Distinguished by Balkum v. Sawyer, N.D.N.Y., October 21, 2011

1993 WL 428509
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Duaut Abdut DUAMUTEF, Plaintiff,

v.

Arthur LEONARDO, Superintendent, Great
Meadow Correctional Facility, K. Smith, Defendants.

No. 91–CV–1100.
|
Oct. 22, 1993.

**Attorneys and Law Firms**

Duaut Abdut Duamutef, pro se.

Robert Abrams, Atty. Gen. of State of N.Y., Albany
Darren O'Connor, Asst. Atty. Gen of Counsel, for
defendnats.

### REPORT–RECOMMENDATION

HURD, United States Magistrate Judge.

*1 This matter has been referred to the undersigned for
a Report–Recommendation by the Honorable Neal P.
McCurn, United States Senior District Judge, by Standing
Order dated August 2, 1985.

This is a civil rights action pursuant to 42 U.S.C. § 1983,
alleging violation of the plaintiff's Fourth, Eighth, and
Fourteenth Amendment rights. At the time of the alleged
unconstitutional acts, plaintiff was an inmate at the
Great Meadow Correctional Facility in Comstock, New
York. Defendant Arthur Leonardo is Superintendent, and
defendant Kevin Smith is a sergeant at the facility.

Plaintiff claims that on several occasions he was
unreasonably subjected to a "strip frisk" [1]—a search
which includes a visual body cavity inspection. Plaintiff
further claims that these searches were conducted
in a "degrading" and "dehumanizing" manner, that
he was threatened and harassed during the searches,
and that at least one of the searches was done in
retaliation for plaintiff's "complaints and suit filed in the

courts." (Compl. at 2) In addition, plaintiff claims that
defendant Leonardo violated his constitutional rights by
failing to reply to his letter regarding the searches, and
by failing to investigate his formal complaint. Plaintiff
seeks compensatory and punitive damages as well as
injunctive relief "restraining the defendants." (Compl. at
2) Presently before this court is plaintiff's motion for
summary judgment, and defendants' cross-motion for
summary judgment. For the reasons set forth below, the
plaintiff's and the defendants' motions are denied in part
and granted in part.

### MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment may be granted only
when the moving party carries its burden of showing the
absence of a genuine issue of material fact. Fed.R.Civ.P.
56; Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell,
Partnership v. Medfit Int'l, Inc, 982 F.2d 686, 689 (1st
Cir.1993); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d
Cir.1990) (citations omitted). "Ambiguities or inferences
to be drawn from the facts must be viewed in the
light most favorable to the party opposing the summary
judgment motion." Id. In other words, a motion for
summary judgment pursuant to Fed.R.Civ.P. 56 shall
be granted only when the pleadings, evidence obtained
through discovery, and affidavits show that there is no
genuine issue as to any material fact, and that the moving
party is entitled to summary judgment as a matter of law.
Lang v. Retirement Living Pub. Company, 949 F.2d 576,
580 (2d Cir.1991). Therefore, "summary judgment will not
lie if the dispute about a material fact is genuine, that is,
if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party." Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).

Thus, if the nonmoving party can not produce sufficient
evidence to support the jury verdict, summary judgment is
proper. Id. at 249. "In determining how a reasonable jury
would decide, the Court must resolve all ambiguities and
draw all inferences against the moving party." Lang, 949
F.2d at 580. However, when the moving party has met the
burden, the nonmoving party must do more than "simply
show that there is some metaphysical doubt as to the
material facts." Matsushita Electric Industrial Company
v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986); see
also Liberty Lobby, 477 U.S. at 247–48. At that point, the
nonmoving party must come forward with specific facts

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)
Case 9:16-cv-00015-BKS-DEP   Document 60   Filed 01/08/18   Page 27 of 68
1993 WL 428509

showing that there is a genuine issue for trial. *Id.* "The judge's function is not to weigh the evidence and determine the truth of the matter," *Liberty Lobby,* 477 U.S. at 248, "such is the prerogative of the finder of fact." *Murphy v. Provident Mutual Life Insurance Company,* 923 F.2d 923, 930 (2d Cir.1990)* (Kearse, J., dissenting), *cert. denied, 502 U.S. 814, 112 S.Ct. 65 (1991).* Therefore, the judge's role is "to determine whether there does indeed exist a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249. In a case where both sides have moved for summary judgment, as is the case at bar, each side must sustain its burden of proving the absence of disputed issues of material fact in order to be successful.

## DISCUSSION

**\*2** Plaintiff herein alleges that he was subjected to five unreasonable searches in violation of the Constitution and of New York State's prison policy. The circumstances surrounding each of those searches differ, and therefore, will be discussed below in connection with the court's analysis. In the process of this analysis, the court must address two issues: What standard of review is appropriate for constitutional challenges to prison practices, or as is the case present here, the actions of a single correctional officer; and should that standard be heightened when the disputed action violated the state's own prison directives?

In general, constitutional challenges to prison practices receive a deferential standard of review. *See Turner v. Safley,* 482 U.S. 78 (1987). While prisoners do in fact retain some constitutional rights, *see Wolff v. McDonnell,* 418 U.S. 539, 555–56 (1974) ("There is no iron curtain drawn between the constitution and the correctional facilities of this country."), [2] including the right to be free from unreasonable searches, many of those rights are sharply limited by the compelling governmental interest in maintaining safe and secure prisons. *Price v. Johnston,* 334 U.S. 266, 285 (1948) ("retraction [of constitutional rights] justified by the considerations underlying our penal system"). In examining claims of constitutional violations in the prison context, courts generally need only determine whether the challenged prison practice or regulation is reasonably related to a legitimate penological goal, or whether it is an "exaggerated response" to security concerns. *Turner,* 482 U.S. at 87; *Pell v. Procunier,* 417 U.S. 817, 827 (1974). Thus, the court should defer to prison officials' judgment so long as there exists a rational

connection between the judgment and the legitimate governmental interest put forward to justify it. *Id.* at 89–90. On the other hand, it stands to reason that closer judicial scrutiny is warranted when the practice appears unreasonable on its face. In this way, courts can protect prisoners' limited constitutional rights without unduly interfering with the government's interest in the effective administration of its prison system.

Under this balance of interests, a prisoner's Fourth Amendment privacy rights must often yield to the governmental interest in preventing contraband from entering the prisons. Nonetheless, noting that a visual body cavity search "gives us the most pause," the *Bell* court held that searches must be reasonable even in the prison context. *See Bell v. Wolfish,* 441 U.S. 520, 558 (1979). The difficulty, as is usually the case, lies in determining "reasonableness" in a prison setting. As the Supreme Court noted in *Bell,*

> [T]he test of reasonableness under
> the fourth amendment is not capable
> of precise definition or mechanical
> application. In each case it requires
> a balancing of the need for
> the particular search against the
> invasion of personal rights that the
> search entails. Courts must consider
> the scope of the particular intrusion,
> the manner in which it is conducted,
> the justification for initiating it, and
> the place in which it is conducted.

**\*3** *Id.* at 559.

In applying this balancing test, the *Bell* court found that routine visual body cavity searches conducted after every contact visit with a person from outside the institution are not *per se* unreasonable if the searches are conducted in a reasonable manner. Therefore, although *Bell* did not hold that visual body cavity searches are *per se constitutional, Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981), they are permitted if reasonably related to a significant and legitimate penological goal and conducted in a reasonable manner. *Bell,* 441 U.S. at 560. Therefore, some level of justification is required for a visual body cavity search even in a prison setting. *Cf. Hodges v. Stanley,* 712 F.2d 34, 36 (2d Cir.1983) (*citing Bono v. Saxbe,* 620 F.2d 609, 617 (7th Cir.1980) (*Bell* rationale does not justify strip searches after noncontact supervised visits absent "showing that

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)
1993 WL 428509

Case 9:16-cv-00015-BKS-DEP    Document 60    Filed 01/08/18    Page 28 of 68

there is some risk that contraband will be smuggled into" prison.))

Additionally, in New York State, the Department of Correctional Services (DOCS) has promulgated a policy directive detailing the specific situations under which a strip frisk may be conducted, and the procedural guidelines that must be followed. *New York State DOCS,* Directive No. 4910, at 10–12 (1984) ( "Directive"). Drafted in accordance with a consent decree in a class action case, *Hurley v. Ward,* 77 Civ. 3847 (RLC) (S.D.N.Y.1983), but after the Supreme Court decided *Bell v. Wolfish,* Directive No. 4910 presumably expresses the Department's view of when "some level of cause" exists; that is, when a strip frisk serves the legitimate penological goal of keeping contraband out of prisons. In negotiating and drafting this Directive, DOCS not only included all those situations in which a strip frisk was necessary, the Directive repeatedly declares that strip frisks done in accordance with the provisions outlined shall be the *only* strip frisks conducted without probable cause.[3] Yet in this case, two of the disputed searches clearly violated Directive No. 4910's prohibition of strip frisking Special Housing Unit (SHU) transferees upon re-entry into the SHU. Therefore, since DOCS has memorialized the instances where a search is justified by legitimate penological goals, the court must determine whether the searches at issue were reasonable in light of the articulated legitimate security concerns of the prison. While the defendants' violation of prison policy does not necessarily amount to a constitutional violation, it does give the court pause to question the actions of the defendants.

Courts normally defer to the experienced judgments made by prison officials in drafting operational policies because those in the business of running our prison systems are in the best position to determine when, for example, a strip frisk is necessary. Prison administrators—not courts—have the authority, expertise, and knowledge of day to day prison operations. *See Pell,* 417 U.S. at 827; *Procunier v. Martinez,* 416 U.S. 396, 404–05 (1974). DOCS standard procedure for issuing directives incorporates that expertise and knowledge extensively. Before being issued to the states' prisons, directives are subjected to six tiers of review. After the directive is adopted, individual correctional facilities are given the opportunity to apply for an exemption or variance. Thus, the administrative arm of DOCS thoroughly studies the subject of a policy directive before issuing it, and despite

that extensive review, if it fails to take account of the particular needs of an individual facility, then there is a procedure in place to adjust the policy accordingly. *New York State DOCS,* Directive No. 0001 (1987). Although this particular Directive was the result of a class action, the court may nonetheless presume that DOCS carefully considered the provisions to which it was binding itself. To be sure, given that it would be easier for DOCS to amend an ordinary directive than it would be to alter the terms of a consent decree, Directive No. 4910 was probably reviewed more rigorously than a routine directive.

**\*4** However, in this case, unlike *Bell* and *Turner* which examined the reasonableness of a prison *policy,* the court is called upon to examine the judgment of a single corrections officer acting in violation of DOCS policy. Therefore, the court cannot justify a deferential standard of review regarding those searches based on the expertise of the relevant administrative agency. Furthermore, if the court is to show consistent respect for the expertise of DOCS administrators, it must necessarily scrutinize the reason for an aberrational search more closely.

*The First Search of February 22, 1991:*
The events leading up to the first strip frisk are in dispute. Defendant Smith alleges that an Officer Hendry ("Hendry") observed the plaintiff pick up a white object and put it in his pocket. Allegedly, when Hendry asked the plaintiff about the object, the plaintiff threw the article into the corner of the stairwell and lunged at Hendry, resulting in a scuffle in which plaintiff and Hendry were slightly injured.[4] After this incident, the plaintiff was taken to the facility infirmary where he was strip frisked prior to his treatment for injuries resulting from the incident. Smith argues that he had probable cause for this first strip frisk. According to Directive No. 4910, a strip frisk or strip search may be conducted when a corrections officer has probable cause to believe an inmate is in possession of contraband capable of being secreted in anal or genital areas. In contrast, the plaintiff claims that he was assaulted by an unidentified person, that he was not acting in an aggressive manner, that he did not pick up a white object off the floor, and that he "was set up by Smith and Hendry and other officers." (Plaintiff's Reply at 9.)

Regarding this first search, the court recommends denying both the plaintiff's and the defendants' motion for

Case 9:16-cv-00015-BKS-DEP    Document 60    Filed 01/08/18    Page 29 of 68

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

summary judgment since there is a genuine issue of material fact. If the plaintiff's version of the events is true, and he was in fact "set up", in part by Smith (the same officer authorizing the strip frisk), then he would be entitled to judgment as a matter of law since under those circumstances the officers would have had absolutely no reason to strip frisk the plaintiff. On the other hand, if the defendants' version of the facts is true, then the defendants would be entitled to summary judgment since under the reasoning of both *Bell* and *Turner,* it is not unreasonable to strip frisk a prisoner found in possession of contraband capable of being secreted in body cavities. To be sure, contraband is more likely to be found on an inmate who has demonstrated his desire to harbor prison contraband in the past, than on a prisoner who happens to engage in a contact visit. In this situation, the strip frisk is reasonably related to a legitimate penological goal, namely maintaining security by preventing prisoners from harboring contraband.

The evidence submitted in support of each party's version of the events requires a credibility determination not appropriate for summary judgment. While defendant Smith submitted an "Unusual Incident Report" in addition to his affidavit in support of his motion; a jury could reasonably question its reliability as evidence, particularly since neither the author of the report nor the source of the information contained within it are identified. The remaining evidence, (conflicting affidavits submitted by both the plaintiff and the defendant Smith) is not sufficient to support a jury verdict in either party's favor.

*The Second Search of February 22, 1991:*

**\*5** Following his medical treatment, the plaintiff was escorted to the SHU where he was strip frisked again. Because of the heightened security needs of an SHU, Directive No. 4910(D)(5) provides for a strip frisk upon an inmate's initial entry into a special housing unit. While the first search of plaintiff before entry to the infirmary normally would have sufficed, Smith claims that a second search was necessary because security personnel did not maintain continuous observation of the plaintiff during the medical treatment. Thus, it is argued that the plaintiff could have gained possession of any one of a variety of items in the infirmary. The plaintiff, on the other hand, steadfastly insists that corrections officers continuously observed him in the infirmary, that he was never alone with the medical staff, and that he was kept in handcuffs

and leg irons precluding any cause for the second strip frisk. [5]

*Hodges,* 712 F.2d 34 and *Morgan v. Ward,* 699 F.Supp. 1025 (N.D.N.Y.1988) are factually similar to this case. Ruling on a motion to dismiss, the *Hodges* court found a second search of an SHU inmate unnecessary when it took place "shortly after the first" and when the inmate had been "under continuous escort," reasoning that there was no possibility that the plaintiff could have obtained and concealed contraband. *Hodges,* 712 F.2d at 35. Similarly, in *Morgan,* Judge Munson found that strip frisks were unconstitutional when routinely conducted both before and after inmates exit a special housing unit. *Morgan,* 699 F.Supp. at 1051. The plaintiffs, in *Morgan* complained of strip frisks conducted both before and after contact visits, as well as strip frisks conducted before attending adjustment committee meetings. The *Morgan* court condemned those strip frisks as unnecessary since there was no danger of an inmate smuggling something out of the Spartan like cells typical of SHU confinement. *Id.* at 1052.

The clear holding of both *Hodges* and *Morgan* is that a redundant or wholly unnecessary strip frisk is presumptively unreasonable. [6] *See also Hurley v. Ward,* 584 F.2d 609 (2d Cir.1978) (unnecessary strip frisks unreasonable and therefore, unconstitutional). If an inmate has no opportunity to obtain and secret contraband in his body cavities between the two searches, then a second search of the prisoner's body cavities is unnecessary and therefore unreasonable. Thus, if, as the plaintiff alleges, he was continuously observed by security personnel, then he is entitled to judgment as a matter of law.

The defendants, however, contend that the plaintiff was not continuously observed by security personnel. It is not known whether security personnel lost sight of plaintiff for a split second, several minutes, or longer as defendants claim. Security personnel's failure to maintain "continuous observation" of a prisoner who is handcuffed and shackled with leg irons does not by itself justify a second strip frisk. While it is theoretically possible for a prisoner to gain possession of contraband in an infirmary, and then covertly secret it in a body cavity even when he is handcuffed, shackled with leg irons, and observed by medical personnel; the degree to which the possibility exists fluctuates with the amount of time

plaintiff was unobserved by security personnel. *Cf. Bell,* 441 U.S. at 577–78 (Marshall, J., dissenting) ("inserting an object into the rectum is painful and 'would require time and opportunity which is not available in visiting areas.' " (citation omitted)). Considering the "scope of the strip frisk" and the "justification for initiating it," *Bell,* 441 U.S. at 559, a second visual body cavity search conducted on the grounds that security personnel merely glanced away for several seconds is more akin to an "exaggerated response," *see Turner,* 482 U.S. at 87, than a reasonable search. Conversely, if security personnel did, in fact, lose sight of plaintiff for a significant length of time, it may not have been unreasonable to strip frisk the plaintiff a second time so as to ensure the integrity of the special housing unit which he was entering. In sum, there is a genuine issue of material fact regarding the length of time plaintiff was unobserved, and his physical circumstances, i.e., whether he was, in fact, handcuffed and shackled with leg irons.[7]

*The Search of March 8, 1991:*
 **\*6** The third strip frisk which plaintiff complains of occurred on March 8, 1991, when he returned from a "legal visit." Insofar as defendant Smith is concerned, the court recommends granting his motion for summary judgment regarding this search because the plaintiff has not identified Smith as a party to the search despite several opportunities to do so.

However, as far as defendant Leonardo is concerned, the court recommends that both the plaintiff's and Leonardo's motions be denied. The plaintiff's motion should be denied because there is a genuine issue of material fact—plaintiff does not specify whether or not the alleged visit was a contact or a noncontact visit. *Bell* clearly established that inmates may be routinely strip frisked after contact visits, *Bell,* 441 U.S. at 558–560; but they may not be strip frisked after noncontact visits. *See Id.* at 559 n. 40; *see also Bono,* 620 F.2d at 617. Furthermore, the Attorney General contends prison records indicate that plaintiff did not receive a legal visit on March 8, and that there was no strip frisk of the plaintiff on that date (Def. Local R. 10(j) Statement at ¶ 8; Smith Aff. at ¶ 9); but none of these alleged records were submitted to the court. The moving party has the burden of showing the absence of a genuine issue of material fact, Fed.R.Civ.P. 56, yet in regard to this search, the court has been given so few facts and no evidence, that it cannot determine whether a search even occurred. Since both the plaintiff and the defendant

Leonardo carry the burden of moving parties, this court recommends that neither motion be granted.

*The Search of April 17, Vis-a-vis Defendant Smith:*
The plaintiff also fails to name defendant Smith as a participant in the April 17, search despite several opportunities to do so. Accordingly, the court recommends granting defendant Smith's motion for summary judgment regarding the search of April 17, 1991. Nonetheless, the constitutionality of this search is relevant to the plaintiff's claim against defendant Leonardo. Since the facts of that search are nearly identical to the fifth search of July 31, the analysis is the same and may be applied to both searches.

*The Searches on April 17, 1991, and July 31, 1991:*
The fourth strip frisk at issue here occurred on April 17, 1991, after the plaintiff was transferred from a SHU at one prison to the SHU at Great Meadow. The plaintiff claims that the search was unreasonable since he had been strip frisked prior to leaving the SHU from which he was transferred. Surprisingly, the State pled no facts regarding this search in its Local Rule 10(j) statement; and in its memorandum of law it mentioned the search only briefly, arguing that it "was conducted only after plaintiff had been in transport[8] and was admitted into the special housing unit." (Def.Mem. of Law at 11) On that basis alone, the state insisted that it "was rationally related to a legitimate penological objective, and therefore withstands constitutional scrutiny." *Id.*

 **\*7** On July 31, 1991, the plaintiff was similarly strip frisked upon entry to the Great Meadow SHU after exiting another facility's SHU where he had also been strip frisked. Defendant Smith contends that the transfer permitted contact between the plaintiff and non-SHU inmates; whereas the plaintiff alleges that there was "no logical reason" for the second strip frisk since he was seated alone, "shackled up with handcuffs and leg irons," and under the guards' observation during his transport.

Again, both *Hodges v. Stanley* and *Morgan v. Ward* establish that unnecessary or redundant strip frisks violate prisoners' Fourth Amendment privacy rights. However, the Attorney General argues that the strip frisks were justified by the transport of plaintiff. At first glance, this justification appears rationally related to the state's goal of preventing contraband from entering special housing

Case 9:16-cv-00015-BKS-DEP    Document 60    Filed 01/08/18    Page 31 of 68

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

units where security concerns are at their highest; but, Directive No. 4910(D)(2)(c)(5) explicitly states:

> When an inmate is transferred from one facility SHU to another facility SHU, he may be strip frisked upon exiting the facility *but may not be strip searched or strip frisked upon entry to the receiving facility and/or its SHU.*

Directive No. 4910 at 11 (emphasis added). Moreover, in that same section, the Directive commands that "[n]o other strip frisk will be conducted except in accordance with other provisions in this directive." *Id.* Thus, this second search appears to violate not only the rule of *Hodges* and *Morgan,* but the Directive itself.

In its memorandum of law, the Attorney General argues that the Directive prohibiting strip frisks of inmates entering a SHU after exiting a SHU "does not apply where the inmate is transported on a bus where he could easily come into contact with other non-special housing unit inmates." (Def.Mem. of Law at 2.) In support of this assertion, the state cites only to defendant Smith's affidavit. However, the Directive not only fails to include this so called "exception" described by defendant Smith, but it prohibits such an exception by repeatedly declaring that "no other strip frisk will be conducted except in accordance with other provisions in this directive." The circumstances of this search do not even arguably implicate any of the Directive's other grounds for conducting strip frisks. [9] In sum, despite the defendants' clever attempt to create the illusion that these searches were conducted under the guise of a prison policy, the court cannot accept defendants' proffered justification. Both the April 17, and the July 31, searches violated clearly expressed prison policy. Once again, while a violation of the Directive alone does not necessarily amount to a constitutional violation, it nonetheless makes it difficult, at best, for the court to countenance defendants' argument that there is an "exception"—an alternative policy—to the DOCS prohibition of strip frisks upon entering an SHU after exiting another SHU. [10] DOCS utilized its expertise in determining that such searches were unnecessary as a matter of policy, yet defendants' only proffered justification for the particular search is a nondocumented policy. The court cannot defer to individually determined

policies as justification for such an invasive search as a visual body cavity inspection because the purposes of judicial deference to administrative agencies are absent. Smith is undoubtedly more familiar than the court with the day to day operations of his job, but he is not in a position to develop his own prison policy. If Smith had advanced a particularized justification for these searches —rather than a nonexistent policy exception—then the court would be more inclined to defer to his on-the-job judgment. *See Gomez v. Coughlin,* 685 F.Supp. 1291, 1300–01 (S.D.N.Y.1988) (deference is appropriate when search is reasonably justifiable). But, that is not the case here.

**\*8** In essence, then, the Attorney General is asking the court to give constitutional approval to the judgment of a single corrections officer—a rogue guard—where that judgment is clearly at odds with that of DOCS, and where there was no particularized cause for searching the plaintiff. Although particularized cause for a visual body cavity search is not constitutionally required when the search is conducted pursuant to a valid policy, *see Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992) (holding that random searches conducted pursuant to a policy designed to assure their "randomness" are legitimately related to the goal of deterring prisoners' possession of contraband); when a search expressly violates prison policy, the Constitution requires that some justification for conducting the *particular* search must be established. In short, since Smith was acting in violation of a constitutionally sound prison policy when he conducted these searches, he must provide some particularized justification, demonstrable by facts and circumstances, or reasonable inference drawn therefrom, i.e. reasonable suspicion, to believe that the opportunity existed for plaintiff to secreted contraband on his person. Here, as his justification, Smith only offers his own version of Directive No. 4910, one that is not justified by the language of the directive.

Regarding the July 31 search, Smith does offer justification for the search. He states that the transportation of the plaintiff "permitted contact" between the plaintiff and non-SHU inmates. He argues that the Directive does not apply. Significantly, Smith does not argue that contact between the plaintiff and non-SHU inmates occurred. [11] Smith also does not offer any other justification for this particular search of the plaintiff. Smith attempts to similarly justify the April 17 search,

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

arguing that plaintiff was in "transport" between his exit from one SHU and his entry into another SHU. In fact, Smith argues that Directive No. 4910, which expressly prohibits a strip search of an inmate upon his arrival from SHU confinement at another facility, allows an exception when the inmate has been transported by bus, as opposed to car or van. *Affidavit of Kevin Smith,* ¶ 4.

Directive No. 4910 does not provide for such an exception, but it expressly prohibits any search conducted not in accordance with its terms. Such assertion by the defendants is preposterous. The court, then, must assume that the defendants intended to argue that Smith conducted a search not in accordance with the Directive because he had reasonable suspicion to believe that plaintiff might have been in possession of contraband capable of being secreted. Therefore, the court must evaluate Smith's conduct in light of constitutional standards, as opposed to deference to conduct pursuant to a valid prison policy.

To be sure, it *may* have been possible for the plaintiff to covertly obtain and secret contraband in a body cavity while under continuous escort by security personnel. However, a strip frisk requires more than a metaphysical possibility that the circumstances of the transport merely permitted contact. Smith must have reasonable justification, based on articulable facts, to believe that plaintiff was in possession of contraband. Although Smith has stated that he determined that a strip frisk was warranted in light of plaintiff's transportation on a bus, the court can not accept such a justification in light of DOCS's considered judgment that a second search of SHU transferees is expressly prohibited. The obvious implication of the Directive is that normal procedures for transferring SHU inmates does not require a search both before and after a transfer. Since Smith has not alleged that the July 31, transfer of plaintiff was not according to routine procedures, his argument fails.

**\*9** Similarly, Leonardo's proffered justification for the April 17 search—that plaintiff was in "transport"—also fails. An SHU transfer necessarily involves "transport". In its decision to prohibit strip frisks of SHU transferees by the receiving facility, DOCS can be presumed to have considered and dismissed the possibility that inmates could obtain and secret contraband in their body cavities while in transport from one SHU to another. In conclusion, the court cannot deem reasonable, a search

as invasive as a visual body cavity inspection when not conducted pursuant to a prison policy or with some particularized cause. [12] Therefore, this court recommends that District Court find that both the April 17, and July 31, searches were violations of the plaintiff's Fourth Amendment right to be free from unreasonable searches.

*Defendant Leonardo:*
The plaintiff names Leonardo in his complaint on the grounds that Leonardo was informed of unconstitutional searches, but failed to take any action. Specifically, plaintiff alleges that on April 26, 1991, he wrote Leonardo a letter [13] informing him of the strip frisks that had occurred up to that time, and requested relief. In addition, the plaintiff claims he filed a complaint with the grievance committee on the same day, to which there was no response or investigation. Moreover, according to the plaintiff, Prisoners' Legal Services wrote to Leonardo regarding the strip frisks, including the July 31 search. While Leonardo did not submit any affidavit in connection with these proceedings, the State disputes plaintiff's allegation "that defendant Leonardo was informed of any strip frisks which warranted corrective supervisory action, ... that defendant took no investigatory action in response to plaintiff's complaint, ... that Great Meadow officials improperly responded to a grievance, ... and that Great Meadow officials improperly responded to a complaint filed about the July 31 frisk." (Defs.' Local R. 10(j) Statement at ¶ 10)

The State, however, has submitted no evidence in support of these counter allegations. Rather, it argues that Leonardo cannot be held liable since the searches were legitimate and constitutional. Alternatively, the state argues that Leonardo was not personally involved as required in [Section 1983](#) actions for damages, since "there was *nothing to indicate* ... that strip frisks of the plaintiff were being conducted in an unconstitutional manner." (Def.Mem. of Law at 11, emphasis added)

Naturally, if the searches violated no constitutional right, then Leonardo cannot be held liable for Smith's actions. However, as discussed above, both the April 17, and the July 31, searches were unconstitutional. Thus, if Leonardo was personally involved in those searches, then the plaintiff is entitled to judgment as a matter of law. Conversely, if Leonardo was not personally involved, then the defendant is entitled to summary judgment.

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

**\*10** Therefore, the first question is whether Leonardo was personally involved in the unconstitutional searches of the plaintiff. In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit set out the ways in which a defendant may be personally involved in a constitutional violation:

> The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

Leonardo falls within the category of a supervisory official who fails to take corrective action after learning of the violation. According to the plaintiff, he wrote Leonardo a letter on April 26, chronologically describing the strip frisks to which he had been subjected to prior to that date. Plaintiff alleges that after the July 31 search, at his request, Prisoners Legal Services also wrote to Leonardo regarding the strip frisks. Thus, if what plaintiff alleges is true, then Leonardo had either 'actual or constructive notice' of the unconstitutional searches. *See Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1066 (2d Cir.1989). In any event, the veracity of the plaintiff's allegations is not a material issue since the state does not deny that Leonardo was aware of the searches.[14]

Supervisory liability is premised on the 'gross negligence' or 'deliberate indifference' demonstrated by the supervisor's failure to take corrective action after learning of the constitutional violation. *McCann v. Coughlin* 698 F.2d 112, 125 (2d Cir.1983). Thus, whether or not Leonardo took investigatory action in response to the plaintiff's complaint is a material fact. The state denies plaintiff's allegation that Leonardo took no

investigatory action. Interestingly, however, the State submitted no evidence of the investigatory action, nor an affidavit by Leonardo attesting to his actions. In short, the State attempts to create a dispute of material fact by simply denying plaintiff's allegations. However, "[m]ere conclusory allegations or denials will not suffice." *Williams,* 781 F.2d at 323. If, in fact, an investigation occurred, the court presumes that the State would have properly submitted evidence of it. Without evidence of an investigation, the court must presume it did not occur. In other words, from the court's perspective, Leonardo was apprised of obviously unreasonable searches that violated both the constitution and DOCS policy, yet he did nothing. Given the fact that the plaintiff had been unreasonably searched not once, but twice, Leonardo's failure to respond to his complaints is akin to 'gross negligence' or 'deliberate indifference.' Either characterization subjects him to supervisory liability, and therefore, the court recommends denying his motion for summary judgment and granting the plaintiff's motion for summary judgment regarding the searches of April 17, and July 31.

*Qualified Immunity:*

**\*11** Both defendant Smith and Leonardo argue that even if they did violate plaintiff's constitutional rights, they are entitled to qualified immunity from liability. The qualified immunity doctrine insulates a governmental official performing discretionary functions from liability so long as his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The qualified immunity defense will not be overcome when the rights are ephemeral. *Eng,* 858 F.2d at 895. The defendants, acting in their official capacities, must have acted reasonably in order to be accorded qualified immunity. *Harlow,* 457 U.S. at 818; *Wyler v. United States,* 725 F.2d 156, 159 (2d Cir.1983). "Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official act ... turns on the 'objective reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson,* 483 U.S. at 639 (*quoting Harlow,* 457 U.S. at 818–19; *Mozzochi*

Case 9:16-cv-00015-BKS-DEP    Document 60    Filed 01/08/18    Page 34 of 68

Duamutef v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

*v. Borden,* 959 F.2d 1174, 1177 (2d Cir.1992). This does not mean, however, that for a plaintiff to remove the cloak of qualified immunity the very action taken by the defendant, under the circumstances confronting the defendant, must have previously been declared unlawful. *See Finnegan v. Fountain,* 915 F.2d 817, 823 (2d Cir.1990); *Neu v. Corcoran,* 869 F.2d 662, 665 (2d Cir.1989), *cert. denied,* 493 U.S. 816 (1989). Rather, the unlawfulness must be apparent in light of preexisting law. As such, the defense of qualified immunity "provides ample support to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed,* 504 U.S. 911, ——, 112 S.Ct.1934, 1944 (1991) (*quoting Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

The court finds that in this case the law was clearly established that the defendants could fairly be expected to discern its contours. First, *Bell* clearly established that visual body cavity searches must be conducted pursuant to a "legitimate penological goal." Although defendants attempted to argue that the "transfer" or "transport" of plaintiff gave rise to a legitimate security concern, viewed objectively they had absolutely no reason to believe that their security concerns were legitimate under the circumstances. Indeed, given DOCS explicit prohibition of strip frisks of SHU transferees at the receiving facility, defendants, acting on less than probable cause or even reasonable suspicion, were forewarned that their alleged security concerns were more akin to an "exaggerated response," *Turner,* 482 U.S. at 87, than a legitimate penological goal. To be sure, *Turner's* articulation of the rational relationship test (whether the prison policy serves a legitimate penological goal, or whether it is an exaggerated response) put defendants on notice that there are limits to what may be considered a legitimate penological goal.

**\*12** Second, *Hodges,* coupled with a series of district court cases, *see e.g., Morgan v. Ward,* 699 F.Supp. 1025; *Hurley v. Ward,* 549 F.Supp. 174 (S.D.N.Y.1982); *Frazier v. Ward,* 426 F.Supp. 1354 (N.D.N.Y.1977), constitutes a sufficient warning that the strip frisks of April 17, and July 31, were unconstitutional. Each of those cases dealt specifically with repeat searches of SHU inmates.

Finally, while repeat strip frisks were upheld by the Ninth Circuit, *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988), the searches at issue in *Michenfelder* were conducted pursuant to an articulated policy; whereas in

this case, Smith was acting well beyond his authority in conducting the search on July 31, and Leonardo shirked his responsibility by condoning searches deemed unnecessary by their superiors.[15] To be sure, the Attorney General has cited no cases authorizing correctional employees to define and implement individual policies which are contrary to the statewide prison policy, and which lack a legitimate penological objective.

When Smith and Leonardo took it upon themselves to perform their jobs in violation of prison policy and clearly established law, they took a risk that their conduct would be found unconstitutional. Under these circumstances, the qualified immunity defense is not available. Qualified immunity was designed to accommodate the competing purposes of avoiding excessive disruption of governmental functions, and protecting the public's interest in deterring unlawful conduct and compensating victims. *Harlow,* 457 U.S. at 819. It would be anomalous, at best, for the court to grant the defendants' qualified immunity when their conduct was unauthorized—indeed prohibited—by the government agency responsible for administering the state's correctional services. There is no risk of disrupting the relevant governmental function in this case. In sum, since the purpose of qualified immunity would not be fulfilled in this case; and since the law prohibiting repeat searches was clearly established at the time they were conducted; the court recommends that the defendants' motion for summary judgment on the grounds that they are qualifiedly immune be denied.

### Miscellaneous Claims:

In his complaint, plaintiff claims that he was repeatedly strip frisked in retaliation for filing lawsuits against prison officials. However, the plaintiff fails to set out either specific or detailed facts supporting his conclusion. In fact, the plaintiff sets out *no* facts to support this aspect of his complaint. It has been a longstanding rule that "a complaint which alleges retaliation in wholly conclusory terms may be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983); *see also Gill v. Mooney,* 824 F.2d 192 (2d Cir.1987). Therefore, the court recommends that the defendants' motion for summary judgment regarding the retaliation claim be granted.

Similarly, plaintiff's claim that he was threatened and harassed during the searches is unsupported by sufficient

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

factual allegations. To be sure, *Bell* mandates that visual body cavity searches be performed in a reasonable manner. *Id.* at 560; *Covino,* 967 F.2d at 80; *see also Schmerber v. California,* 384 U.S. 757, 771–772 (1966). Nevertheless, plaintiff must set out a factual basis for this claim. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ("Complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.") The only factual allegations made in support of these claims are that corrections officers told plaintiff to "shut up" when he "protested the illegality of the search" (Pl.'s Aff. ¶ 4); and corrections officers had their "batons in position as if they were going to strike plaintiff." (Pl.'s Aff. ¶ 7) These allegations do not rise to the level of a constitutional violation under 42 U.S.C. § 1983. "Mere words, however violent, are not held to amount to an assault," *Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.1973), *cert. denied,* 414 U.S. 1033 (1973); *Keyes v. City of Albany,* 594 F.Supp. 1147, 155 (N.D.N.Y.1984); and allegations of verbal abuse and threats do not state a cause of action under 42 U.S.C. § 1983. *See e.g., Morgan,* 699 F.Supp at 1055; *Nelson v. Herdzik,* 559 F.Supp. 27 (W.D.N.Y.1983); *Williams v. Pecchio,* 543 F.Supp. 878 (W.D.N.Y.1982). While raised batons are not "mere words" under the fore-going rationale, their threat does not amount to a constitutional violation. The batons, raised—but never lowered on the plaintiff—were a mere threat of violence, perhaps deliberately done to deter any violent outburst by the plaintiff. Even in the context of a strip frisk, this conduct is not unreasonable in the prison environment. Accordingly, the court recommends that the plaintiff's motion for summary judgment be denied, and that the defendants' motion be granted regarding this claim.

*Eighth Amendment Claim:*

**\*13** Plaintiff also states that the strip frisks deprived him of his constitutional right to be free from cruel and unusual punishment pursuant to the Eighth Amendment. However, to constitute a violation of the cruel and unusual punishment clause, a prisoner must allege something akin to "unnecessary and wanton infliction of pain" or punishment "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.' " *LaBounty v. Adler,* 933 F.2d 121, 123–24 (2d Cir.1991) (citations omitted). Here, plaintiff has alleged only that the defendants caused him "to suffer

constant humiliation, unnecessary psychological pain and distress." (Pl.'s Aff. ¶ 8) Such allegations do not rise to an Eighth Amendment violation. They are unsupported by any evidence in the record, and again, conclusory allegations are insufficient to state a claim under 42 U.S.C. § 1983. *Barr,* 810 F.2d at 363. The court, therefore, recommends that plaintiff's Eighth Amendment claim be dismissed.

CONCLUSION

The court recommends denying both the plaintiff's and the defendants' motions for summary judgment regarding the first and second searches of February 22, because there are genuine issues of material fact. Regarding the alleged search of March 8, the court recommends granting defendant Smith's motion for summary judgment, denying Leonardo's motion, and denying the plaintiff's motion. Regarding the search of April 17, the court recommends that defendant Smith's motion be granted because he did not participate in the search; but defendant Leonardo's motion should be denied and plaintiff's motion granted insofar as Leonardo is concerned, since the search violated plaintiff's Fourth Amendment right to be free from unreasonable searches. The search of July 31, similarly violated plaintiff's Fourth Amendment rights, and therefore, the court recommends that the defendants' motion for summary judgment be denied, and the plaintiff's motion be granted. Finally, the court recommends granting defendants' motion for summary judgment, and denying the plaintiff's motion regarding his claims of retaliation, unreasonable manner of search, and cruel and unusual punishment.

Accordingly, it is

RECOMMENDED, that the plaintiff's and the defendants' motions be granted in part and denied in part consistent with this Report–Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Small v. Secretary of Health and*

Duamuter v. Leonardo, Not Reported in F.Supp. (1993)

1993 WL 428509

*Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e), and it is

**All Citations**

Not Reported in F.Supp., 1993 WL 428509

Footnotes

1    A "strip frisk" as defined by DOC Directive # 4910 means
        a search of an inmate's clothes and body including body cavities. For a male this involves one or more of the following procedures: opening his mouth and moving his tongue from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his armpits, spreading his testicles to expose the area behind his testicles, and bending over and/or spreading his buttocks to expose his anus to the frisking officer. For females the procedures are similar except that females must also squat to expose the vagina. page 4.

2    Inmates retain "those rights [that are] not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Hudson v. Palmer,* 468 U.S. 517, 523 (1984).

3    Probable cause is defined by the same directive:
        Where a correction officer has probable cause to believe an inmate is hiding contraband somewhere in his/her anal or genital areas oris in possession of contraband capable of being secreted in his/her anal or genital areas, the correction officer must report this finding to an officer ranked Sergeant or above in order to secure permission to conduct a strip search or strip frisk.
        Directive 4910 at 10.

4    Plaintiff alleges that he was assaulted by defendant Smith.

5    It should be noted that these factual claims of the plaintiff were made only in his reply to the defendants' 10(j) statement.

6    In *Morgan,* Judge Munson did not specifically condemn the redundancy of the second search. Rather, he found that the first search—upon the inmate's exit from the SHU—was unnecessary. Although *Hodges* condemned the *second* search of the plaintiff, not the first search as in *Morgan,* the distinction is irrelevant since the underlying flaw in both cases was the same—the searches were redundant.

7    It should be noted that while Smith does not specifically dispute the fact that plaintiff was shackled, he does not confirm it either.

8    The Attorney General did not specify any of the circumstances surrounding the transport.

9    It appears to the court that the only other provision possibly applicable to these searches is the "transfer" provision which reads:
        When an inmate is transferred from one DOCS facility to another, he/she may be strip searched at the discretion of the transferring officer at the facility from which he/she is being transferred. The officer conducting the search shall file Form 2063 (formerly I–63) Certificate of Search.... *In the absence of probable cause, he/she will not be strip searched or strip frisked at the receiving facility.* (Emphasis added).
        Thus, according to prison policy, only if Smith had probable cause, could he strip frisk plaintiff at the receiving facility. The defendants do not even attempt to argue that these provisions applied to the searches in dispute. Apparently, this is a deliberate omission: if the search had been conducted pursuant to probable cause, there would have been documentation to prove it since the procedure requires it:
        The officer ranked Sergeant or above must make a determination that there is probable cause to believe that the inmate should be searched. Mere suspicion or belief, unsupported by facts or circumstances, is insufficient.... The Sergeant must record his reason for finding probable cause on the Report of Strip Frisk, Form 1140, which states the inmate's name and number, the time, place, and scope of the search.... The sergeant must sign the report.

10   As previously noted, exemptions and variances to DOCS directives may be made for individual facilities upon request. While the attorney general submitted a copy of Directive No. 4910 with his Local Rule 10(j) Statement, he has not brought any relevant exemption or variance to the court's attention. Thus, the court presumes that none exists and further, that the policies set out in Directive No. 4910 adequately address the security concerns of Great Meadow's superintendents.

11   Without more evidence, the court's conclusion would not be different, even if contact between the plaintiff and non-SHU inmates occurred since the defendant would still have to justify the high level of intrusiveness inherent in a visual body cavity search; particularly since there is nothing to suggest that DOCS overlooked the risk allegedly posed by contact with non-SHU inmates when it explicitly prohibited strip frisks at the receiving facility.

**Duamuter v. Leonardo, Not Reported in F.Supp. (1993)**

1993 WL 428509

12  Although the courts, in light of a valid prison policy, require less than reasonable suspicion to support a visual body cavity search, *see Bell,* 441 U.S. at 563 (Powell, J., concurring in part and dissenting in part), Smith's only justification for the search is his own version of prison policy, which under these circumstances amounts to *no* cause.

13  Plaintiff alleges that on August 6, 1991 he wrote "another letter [ ] complaining about the searches and defendant Smith's action," but he does not indicate to whom this letter was addressed. (Pl.'s Local R. 10(j) Statement ¶ 7)

14  In defendants' Local Rule 10(j) Statement, the Attorney General does deny that Leonardo "was informed of ... searches requiring corrective supervisory action." But in the same sentence, the Attorney General denies plaintiff's allegation "that defendant took no investigatory action in response to plaintiff's complaint." Since Leonardo must have been informed of the searches in order to take investigatory action in response, the Court can safely assume that the Attorney General admits that Leonardo was informed of the searches; and disputes only the conclusion that they "warranted corrective supervisory action."

15  In *Michenfelder,* prisoners, who were the state of Nevada's forty most dangerous inmates, were confined to the maximum security unit at the Nevada State Prison. Pursuant to a prison policy, these inmates were strip searched every time they left or returned to the unit, as well as after movement under escort within the unit. Notwithstanding the fact that these prisoners were the state's most dangerous, the court's reasoning is flawed. While invoking *Turner* to support the proposition that a strip frisk is legitimate so long as there is any possibility that an inmate could come into possession of contraband, the court gave only lip service to the second half of the *Turner* inquiry—that is, whether the policy measure is an "exaggerated response" to security concerns. Apparently, in that court's view, even the most remote possibility that the prisoner was concealing contraband, even when traveling only within the unit while under escort and in chains at all times justified the search. The court held that plaintiff had failed to demonstrate that the defendants' policy was an exaggerated response to security concerns. Presumably, the court thought that the possibility existed that plaintiff would somehow be able to secret contraband in a body cavity while under continuous escort and in chains.

---

End of Document                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6169746
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward TREAT et al., Plaintiffs,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER et. al, Defendants.

No. 9:12–cv–602 (GLS/DEP).
|
Nov. 20, 2013.

**Attorneys and Law Firms**

Edward Treat, Marcy, NY, pro se.

Larry Brown, Marcy, NY, pro se.

Myron Wright, Marcy, NY, pro se.

Richard Zimmer, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Douglas J. Goglia, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

### I. Introduction

**\*1** Plaintiffs *pro se* Edward Treat, Larry Brown, Myron Wright, and Richard Zimmer commenced this action against defendants Central New York Psychiatric Center (CNYPC), the New York Office of Mental Health, Michael F. Hogan, Maureen Bosco, Barbara Miller, Marianne Madia, Anthony Gonzalez, James Morgan, Jeff Nowicki, Terri Maxymillain, Elaine Dziadyk, and Miya Burt, pursuant to 42 U.S.C. § 1983, alleging deprivation of their rights under the Eighth[1] and Fourteenth Amendments of the United States Constitution, section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the New York State Constitution, and the New York State Mental Hygiene Law. (Compl., Dkt. No. 1.) Defendants filed a motion for summary judgment in lieu of an answer,

seeking dismissal of plaintiffs' claims as a matter of law. (Dkt. No. 27.)

In a Report–Recommendation and Order (R & R) dated August 28, 2013, Magistrate Judge David E. Peebles recommended that defendants' motion be granted, plaintiffs' federal claims be dismissed, and the court decline to exercise supplemental jurisdiction over the remaining state law claims.[2] (Dkt. No. 51.) Plaintiffs filed timely objections to the R & R. (Dkt. No. 52.) For the reasons that follow, the R & R is adopted in its entirety.

### II. *Background*

Plaintiffs are four convicted sex offenders who have been involuntarily committed to CNYPC for treatment under the Sex Offender Management and Treatment Act (SOMTA). (Compl.¶¶ 4, 10–17.) Plaintiffs primarily allege that the recently enacted bathroom and shower usage policies at CNYPC have deprived them of life's necessities and subjected them to overcrowding and inhumane conditions, in violation of their substantive due process rights under the Fourteenth Amendment. (*See generally* Compl.)

In May 2010, an emergency bathroom and shower policy was put in place due to several incidents occurring in the bathrooms, including voluntary and involuntary sexual activity, fights, and trafficking of contraband. (Dkt. No. 27, Attach. 4 ¶¶ 18–20.) Under the emergency policy, all of the bathrooms were monitored by Secure Treatment Care Aids (SCTAs) at all times, use of the bathrooms and shower rooms was restricted to one resident at a time, the bathroom in the treatment mall was to remain locked at all times when the SCTAs were unavailable to monitor, and residents were required to register in advance for fifteen minute shower time slots. (*Id.* ¶¶ 21–23.)

In July 2010, final "Resident Bathroom and Shower Policies" were implemented. (*Id.* ¶ 24.) These policies permitted multiple residents to use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m., but retained the single use practice during all other hours in the residential units and at all times in the treatment mall. (*Id.* ¶ 25.) The final policy also expanded the hours during which fifteen minute shower slots were available. (*Id.* ¶¶ 24, 26.)

## III. *Standard of Review*

**\*2** Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N. Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are filed, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. [3] *See id.* at \*4–5.

## IV. *Discussion*

Plaintiffs filed both general and specific objections to the R & R. Plaintiffs' specific objections can succinctly be summarized as follows: (1) Judge Peebles erroneously determined that the bathroom and shower policies only minimally inconvenienced plaintiffs, (Dkt. No. 52 at 1–2); (2) Judge Peebles misapplied the standard of review by reviewing plaintiffs' complaint in the light most favorable to defendants, and erroneously concluded that the policies were implemented due to a legitimate emergency giving rise to security concerns, (*id.* at 2–3); and (3) Judge Peebles failed to review plaintiffs' claims regarding defendants' downgrading of their complaints of abuse, (*id.* at 3). Additionally, plaintiffs filed one general objection, contending that Judge Peebles failed to review their deliberate indifference claim and claims of inhumane and unsanitary conditions, (*id.* at 3, 4). Plaintiffs objections are without merit, and the court addresses each in turn.

### A. *Specific Objections*

Plaintiffs filed three specific objections, which warrant *de novo* review. *Almonte,* 2006 WL 149049, at \*3, \*5.

#### 1. *Inconvenience Imposed By Bathroom and Shower Policies*

First, plaintiffs dispute Judge Peebles' finding that the bathroom and shower policies were merely a modest imposition on plaintiffs. (Dkt. No. at 1, 3.) Specifically, plaintiffs assert that, contrary to Judge Peebles' finding, they were required to wait longer than five or ten minutes to use the bathroom, and in several instances, they were required to wait twenty or forty minutes. (*Id.* at 1–2.) Additionally, plaintiffs argue that, also contrary to Judge Peebles' finding, they did claim that they were denied the right to shower daily, (*id.* at 2), and the new bathroom and shower policies caused "overcrowding conditions," (*id.* at 3). Whether plaintiffs waited five or forty minutes to use the bathroom, or showered every other day, rather than every day, however, plaintiffs have not pleaded facts that give rise to an unconstitutional deprivation of due process. [4]

Individuals in custody do not have a constitutional right to use the bathroom or to shower whenever they please. *See Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at \*4–5 (S.D.N.Y. Sept. 17, 1997) (explaining that the plaintiff's claim that he was denied access to the bathroom for ten hours was not sufficient to survive summary judgment); *see also Davenport v. DeRobertis,* 844 F.2d 1310, 1316–17 (7th Cir.1988) (finding one shower per week for prisoners to be constitutionally sufficient); *Groves v. New York,* No. 9:09–CV–0412, 2010 WL 1257858, at \*8, n. 15 (N.D.N.Y. Mar. 1, 2010) (holding that CNYPC resident's two-hour lapse for request to use bathroom did not give rise to a constitutional violation); *Bourdon v. Roney,* No. 9:99–CV–0769, 2003 WL 2108177, at \*10–11 (N.D.N.Y. Mar. 6, 2003) (dismissing a pre-trial detainee plaintiff's claim where he was denied access to a bathroom for a maximum of three hours); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 211 (N . D.N.Y.2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Instead, state officials are required to provide housing under "humane conditions," and "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Persons in custody are entitled to "[r]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes." *Odom,* 1997 WL 576088, at \*4–5.

**\*3** Here, plaintiffs allege that they were forced to wait up to forty minutes to use the bathroom, (Compl.¶ 69), and that there were an insufficient number of shower slots, causing plaintiffs to occasionally wait until the next day to shower, (*id.* ¶¶ 140–41). Given that ten hours without

2013 WL 6169746

access to a bathroom has been held to be constitutionally sufficient, *Odom,* 1997 WL 576088, at *4–5, and that one shower per week has been held to pass constitutional muster, *Davenport,* 844 F.2d at 1316–17, the CNYCP's bathroom and shower policies do not violate plaintiffs' Fourteenth Amendment due process rights. Accordingly, plaintiffs have failed to allege a violation of their due process rights.

*2. Application of the Standard of Review and Defendants' Legitimate Security Concerns*

Second, plaintiffs contend that Judge Peebles misapplied the standard of review, and further object to Judge Peebles' finding that the bathroom and shower policies were the result of legitimate security concerns. (Dkt. No. 52 at 2, 3.) Plaintiffs' objections are without merit.

In analyzing the shower and bathroom policies, the court must balance plaintiffs' substantive rights against the state's interest in "maintaining institutional security and preserving internal order." *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012) (quoting *Bell v. Wolfish,* 441 U.S. 520, 546 (1979)). While individuals "who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than [prison inmates]," *Youngberg,* 457 U.S. at 321–22, "the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil confinement," *Ahlers,* 684 F.3d at 61. In balancing these competing interests, the defendants' decisions are afforded "a presumption of correctness." *Id.* (quotation marks omitted); *see Youngberg,* 457 U.S. at 324–25 ("The administrators, and particularly professional personnel ... should not be required to make each decision in the shadow of an action for damages.").

Here, defendants' reasons for implementing the bathroom and shower policies are compelling. Defendants stated that the policies were motivated by security concerns, including fighting, involuntary and voluntary sexual activity, and trafficking of contraband, such as tobacco, pornography, and weapons, in the bathrooms and showers. (Dkt. No. 27, Attach. 4 ¶¶ 18–20.) The Supreme Court has noted that policies designed to keep contraband out of jails and prisons have been upheld, *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1516 (2012), and courts in this district have discussed the "societal interest in protecting the health, safety, and welfare of the patients and staff [in a state psychiatric

center] who would be detrimentally affected without sufficient precautionary measures," *Aiken v. Nixon,* 236 F.Supp.2d 211, 232 (N.D.N.Y.2002).

**\*4** Given these compelling state interests, and given "the presumption of correctness" afforded to defendants in this Circuit, the bathroom and shower policies do not violate the Constitution, and Judge Peebles did not err in his application of the standard of review. *Ahlers,* 684 F.3d at 61. Accordingly, plaintiffs have failed to allege a violation of their Fourteenth Amendment due process rights.

*3. Downgrading of Plaintiffs' Complaints*

Third, plaintiffs argue that Judge Peebles failed to review their claim that defendants denied them due process by repeatedly downgrading their complaints of abuse. (Dkt. No. 52 at 3.) Although the R & R does not address this claim, the claim fails nevertheless.

In the prison context, the law is well settled that inmates do not have a substantive constitutional right to grievance procedures. *Brown v. Hogan,* No. 9:07–CV–842, 2009 WL 3756595, at *3–4 (N.D.N.Y. Nov. 6, 2009) (citing *Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003). Further, "a violation of the inmate grievance procedures does **not** give rise to a claim under section 1983." *Id.* at *3. In *Brown,* the court held that "even assuming that [residents] at CNYPC have the same rights as those confined pursuant to criminal convictions, there is no constitutional right to any grievance procedure, and assuming that a grievance procedure exists, there is no constitutional right, protecting the plaintiff from defendants' violation of that procedure." *Id.* at *4. Similarly, here, even accepting all of plaintiffs' allegations as true, there is no federal constitutional right protecting plaintiffs from defendants' violation of CNYPC's grievance procedure. [5] Accordingly, plaintiffs have failed to allege a violation of their Fourteenth Amendment due process rights.

**B. *Plaintiffs' General Objection***

Finally, plaintiffs object to the R & R on the basis that Judge Peebles failed to review their claim of deliberate indifference and failed to review their claims of inhumane and unsanitary conditions. (Dkt. No. 52 at 3, 4.) These are general objections, and the court reviews them for clear error. *Almonte,* 2006 WL 149049, at *4–5.

Plaintiffs' objections are without merit. As an initial matter, Judge Peebles *did* address plaintiffs' claims that defendants acted with deliberate indifference and the conditions in which plaintiffs lived. (R & R at 14–20.) Further, because these objections merely raise arguments that plaintiffs previously addressed, these objections are general and do not warrant *de novo* review. *See Gusky v. Astrue,* No. 10–CV–00919MAT, 2013 WL 3776257, at *3 (W.D.N.Y. July 2, 2013) ("[W]hen the objections simply reiterate previous arguments ... the Court should review the report for clear error."); *Almonte,* 2006 WL 149049, at *4. The court, having carefully reviewed the record, finds no clear error in the R & R.

After careful consideration of the arguments advanced by plaintiffs in their responses to defendants' summary judgment motion and in their objections to the R & R, Judge Peebles' conclusion that summary judgment is appropriate is correct largely for the reasons stated in the R & R.

## V. *Conclusion*

**\*5 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' August 28, 2013 Report–Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED;** and it is further

**ORDERED** that plaintiffs' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

## IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiffs Edward Treat, Larry Brown, Myron Wright, and Richard Zimmer, four convicted sex offenders who have been involuntarily committed to the Central New York Psychiatric Center ("CNYPC") for treatment, have commenced this action, pursuant to 42 U.S.C. § 1983, against the New York Office of Mental Health ("OMH") and several OMH employees alleging deprivation of their civil rights. While their complaint advances other claims, including those based upon the New York State Constitution and various state laws and regulations, plaintiffs primarily allege that they have been deprived of life's necessities by virtue of recently enacted bathroom and shower usage policies at the CNYPC, in violation of their right to substantive due process under the Fourteenth Amendment to the United States Constitution. It is also alleged that employees at the CNYPC have violated section 504 of the Rehabilitation Act, 29 U.S.C. § 794, through the administration of a resident worker program.

In response to plaintiffs' complaint, defendants have filed a pre-answer summary judgment motion seeking dismissal of plaintiffs' claims as a matter of law. For the reasons set forth below, I recommend that the motion be granted, plaintiffs' federal claims be dismissed, and the court decline to exercise supplemental jurisdiction over the remaining state law claims.

## I. *BACKGROUND* [1]

The CNYPC is a mental health facility located in Marcy, New York, and operated by the OMH. Nowicki Decl. (Dkt. No. 27–4) at ¶ 2. Upon enactment of the Sex Offender Management and Treatment Act ("SOMTA"), which became effective on April 13, 2007, the CNYPC became designated as a "secure treatment facility" as defined under N.Y. Mental Hygiene Law ("MHL") §§ 7.18 and 10.03(o) for the purpose of administering a Sex Offender Treatment Program ("SOTP") under the SOMTA. *Id.* ¶¶ 4–6. Each SOTP participant at the CNYPC is an involuntarily committed, formerly incarcerated sex offender or violent offender who has committed a sexually motivated offense and has been found by a state court to be a dangerous sex offender requiring confinement.[2] *Id.* at ¶ 7.

Plaintiffs Edward Treat and Myron Wright are convicted felons who have been civilly committed to the CNYPC for the purpose of undergoing SOTP. Complaint (Dkt. No. 1)

at ¶¶ 10, 14. Plaintiffs Larry Brown and Richard Zimmer are currently civil detainees at the Center, awaiting trial to determine whether they, too, should be detained for the purpose of participating in SOTP. *Id.* at ¶¶ 12, 16.

 **\*6** OMH personnel and staff at the CNYPC assist SOTP-enrolled sex offenders in managing their deviant behavior, while at the same time insuring the operation of a secure facility that protects the community, the staff, and the residents themselves. Nowicki Decl. (Dkt. No. 27–4) at ¶¶ 8–9. SOTP participants are housed in seven residential units, each of which can accommodate approximately twenty-six patients. *Id.* at ¶ 14. Each residential unit includes a bathroom containing four toilet stalls and a urinal, and a residential shower room with two shower stalls, each equipped with a shower curtain. *Id.* at ¶ 15. In addition, there are bathrooms located in the CNYPC treatment mall and activity center; the layouts of those bathrooms are similar to those in the residential wards. *Id.*

Between the hours of 7:00 a.m. and 11:00 p.m., each residential ward, with the exception of the Making a Pro–Social Stance ("MAPSS") unit, which houses residents with high psychopathy (and is therefore more extensively staffed), is monitored by three Secure Care Treatment Aids ("SCTAs"). [3] Nowicki Decl. (Dkt. No. 27–4) at ¶ 16. During the remaining hours, between 11:00 p.m. and 7:00 a.m., there are two SCTAs stationed in the regular residential units. *Id.*

Prior to May 2010, a number of incidents occurred in SOTP bathrooms, including voluntary and involuntary sexual activities in the bathroom and shower stalls, as well as several fights. Nowicki Decl. (Dkt. No. 27–4) ¶¶ 18, 19. Staff at the CNYPC also observed that residents were using bathrooms and showers to hide and pass contraband, including weapons, pornography, and tobacco all of which were found hidden in toilet paper dispensers, behind toilets, in garbage cans, and above tiles in the drop ceilings. *Id.* at ¶ 20. To address these incidents, on May 19, 2010, the CNYPC implemented an emergency policy for SOTP units that required the bathrooms in both the residential portions of the facility, as well as those in the treatment mall and activity center, be monitored by SCTAs at all times. *Id.* at ¶ 21. In addition, the use of bathrooms and shower rooms within the SOTP was restricted to one resident at a time. *Id.* Under the emergency policy, the bathroom in the treatment mall was to remain locked while residents were in treatment,

changing classrooms, being transported to and from the treatment mall, and at other times when SCTAs were unavailable to monitor the area. *Id.*

Shortly after implementation of the emergency policy, employees at the CNYPC determined that certain residents required greater access to bathrooms due to physical or medical problems, or mobility limitations. Nowicki Decl (Dkt. No. 27–4) at ¶ 22. For those residents, access to the bathrooms was allowed even if another resident was already present, provided that an SCTA remained present in the bathroom to continuously monitor the area. *Id.*

A similar emergency policy was implemented on May 24, 2010, governing access to the showers on the residential units. Nowicki Decl. (Dkt. No. 27–4) at ¶ 23. Pursuant to that new, emergency policy, only one resident was allowed into the shower room at a time, and residents were required to register in advance for fifteen minute shower time slots during specified periods when SCTAs would be available to monitor the shower room, thus excluding meal times and periods and when medications were dispensed. *Id.*

 **\*7** On July 13, 2010, final "Resident Bathroom and Shower Policies" were adopted at the CNYPC, replacing the emergency policies implemented in May 2010. Nowicki Decl. (Dkt. No. 27–4) at ¶ 24; Nowicki Decl. Exh. C (Dkt. No. 27–8). Under the new bathroom policy, multiple residents are permitted to simultaneously use the bathrooms within the residential units between the hours of 7:00 a.m. and 11:00 p.m. Nowicki Decl. (Dkt. No. 27–4) at ¶ 25. The single use practice, however, remains in effect under the new policy for the hours of 11:00 p.m. to 7:00 a.m. in the residential units, and at all times for the bathroom in the treatment mall. *Id.* Under the new policy, residents with medical issues who have obtained authorization from a CNYPC physician are allowed to access a bathroom, as needed, with staff approval. *Id.* The final shower policy expanded the hours during which fifteen-minute shower slots were available, including between 5:00 a.m. and 7:00 a.m., as well as during other times of the day when residents are not in programming, therapy, or meals. Nowicki Decl. (Dkt. No. 27–4) ¶¶ 24, 26; Nowicki Decl. Exh. D (Dkt. No. 27–9).

Unrelated to the bathroom and shower policies at the CNYPC are the opportunities available to SOTP residents

to participate in a work program. Nowicki Decl. (Dkt. No. 27–4) at ¶¶ 29–35. Residents at the CNYPC who are undergoing SOTP may qualify for the work program when they advance to a specified point in their treatment and programming, and are referred into the program by their primary therapist. *Id.* at ¶ 33. The resident's physician must approve a work referral before it is submitted. *Id* .

Under the work program, SOTP residents may be assigned to work in the copy center, furniture repair, sewing, laundry, on-mall janitorial, on-unit janitorial, and the library. Nowicki Decl. (Dkt. No. 27–4) at ¶ 34. Participation in the worker program is privilege that residents earn, and, as such, is neither a right nor a requirement for treatment. *Id.* at ¶ 32. By regulation, when residents volunteer to work, they are guaranteed payment of at least the prevailing federal minimum wage. *Id.* at ¶¶ 28. The work program at the CNYPC is so popular among SOTP residents that there is a waiting list to fill program jobs, which are limited in number. *Id.* at ¶ 35.

In their complaint in this action, plaintiffs intimate that they have been forced to work in order to allow the CNYPC to be profitable. *See generally* Complaint (Dkt. No. 1). As a result of that allegation, plaintiffs were removed from the SOTP work program and relieved of their jobs following commencement of the action, although they have been informed that, should they wish to voluntarily participate in the work program in the future, they remain free to do so. Nowicki Decl. (Dkt. No. 27–4) at ¶ 36; *see also* Brown Decl. Exh. 22 (Dkt. No. 39) at 72.

Among the complaints lodged by the plaintiffs in this action is the alleged inadequacy of vocational programs, including the lack of computer training, at the Center. *See, e.g.,* Complaint (Dkt. No. 1) at ¶¶ 63–65, 110–116; Brown Aff. (Dkt. No. 1) at ¶ 30. Generally, however, SOTP residents at the CNYPC are not allowed to use computers. Nowicki Decl. (Dkt. No. 27–4) at ¶ 38. While at one point there was a computer laboratory where residents could receive training in computer skills, because certain residents were found to be making improper use of the computers, the program was abandoned. *Id.* at ¶¶ 39–41.

## II. *PROCEDURAL HISTORY*

**\*8** Plaintiffs commenced this action on April 10, 2012. Dkt. No. 1. Named as defendants in plaintiffs' complaint are the OMH; Michael F. Hogan, Commissioner of the OMH; Maureen Bosco, the Acting Executive Director of the CNYPC; Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC; Terri Maximillian, Director of Clinical Services for the SOTP at the CNYPC; Marianne Madia, a Nurse Administrator at the CNYPC; Anthony Gonzalez, Director of Risk Management at the CNYPC; James Morgan, Associate Director of Quality Management at the CNYPC; Elaine Dziadyk, Acting Deputy Director of Rehabilitative Services at the CNYPC; Miya L. Burt, a Psychiatric Nurse and Ward Supervisor at the CNYPC; and Barbara Miller, CNYPC's Director for Administrative Services. *Id.* at ¶¶ 18–37. Each of the individual defendants is sued only in his or her official capacity. *Id.* at ¶¶ 19–37. Plaintiffs' complaint asserts several federal and state claims, including (1) violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution; (2) violation of the due process clause of the New York State Constitution; (3) deprivation of the rights guaranteed under Article XVI, Section 1 of the New York State Constitution; (4) violation of plaintiffs' right for equal protection under the Fourteenth Amendment (although plaintiffs identify this cause of action as violating their rights under the Eighth Amendment); (5) violation of section 504 of the Rehabilitation Act; and (6) violation of New York State Mental Hygiene Law and corresponding rules and regulations. *Id.* at 26–33.

Following an initial review of plaintiffs' complaint and accompanying *in forma pauperis* ("IFP") applications, Chief District Judge Gary L. Sharpe issued an order on June 21, 2012, (1) granting plaintiffs' IFP applications; (2) dismissing any claims arising under section 504 of the Rehabilitation Act and asserted against defendants Dziadyk, Maximillian and Nowicki in their individual capacities; (3) construing plaintiffs' Eighth Amendment (identified in the complaint as plaintiffs' fourth claim for relief) as a cause of action arising under the Fourteenth Amendment in light of the plaintiffs' status as civil detainees; and (4) denying plaintiffs' motion for class certification, without prejudice to renewal. Dkt. No. 7.

In response to plaintiffs' complaint, defendants filed a pre-answer motion for summary judgment on September 28, 2012.[4] Dkt. No. 27. In their motion, defendants argue that no reasonable factfinder could conclude that plaintiffs' rights under the Fourteenth Amendment and section 504 of the Rehabilitation Act have been

violated by their conduct, and further seek dismissal of any damage claims under section 504 based upon the Eleventh Amendment. *Id.* Plaintiffs have since responded in opposition to defendants' motion. Dkt. Nos. 38–40. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *BACKGROUND*

### A. *Summary Judgement Standard*

**\*9** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades*

*Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Due Process Claim Arising Under the U.S. Constitution*

Plaintiffs' complaint asserts claims arising from alleged violations of their rights under a number of constitutional provisions, including the Eighth Amendment. Complaint (Dkt. No. 1) at 29–30.

When plaintiffs were released by the DOCCS into the CNYPC, they had finished serving their terms of imprisonment, and thus were no longer prison inmates. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, therefore is not applicable under the circumstances, and plaintiffs' claim arises instead under the Fourteenth Amendment. *See Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (holding that the respondent, who was involuntarily committed to a state institution for the mentally retarded, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment). "The Supreme Court has explained that 'when the State takes a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [his] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989)). In this case, plaintiffs' challenges to the various policies and practices referenced in their complaint must therefore be analyzed within the framework of the due process clause of the Fourteenth Amendment. *Sain v. Wood,* 512 F.3d 886, 893 (7th Cir.2008); *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at *7 (E.D.N.Y. Mar. 15, 2007).[5]

**\*10** Because the due process clause requires that civilly committed patients be provided with protections at least as extensive as those to which convicted prisoners are entitled, however, the Eighth Amendment provides a suitable starting point for analysis of plaintiffs' claims. *Sain,* 512 F.3d at 893. Under the Eighth Amendment, state officials are required to provide convicted inmates with housing under "humane conditions," and to afford them "adequate food, clothing, shelter, and medical care."

*Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *see also Sain,* 512 F.3d at 893. A claim alleging that conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement. *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 297 (1991)). The plaintiff must establish that the conditions are "sufficiently serious" from an objective point of view, and additionally that prison officials acted with "deliberate indifference." [6] *Leach,* 103 F.Supp.2d at 546; *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.); *see also Wilson,* 501 U.S. at 303. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *Leach,* 103 F.Supp.2d at 546; *Waldo,* 1998 WL 713809, a *2.

In analyzing the shower and bathroom policies at issue in this case, the court must balance plaintiffs' substantive rights against the state's interest in " 'maintaining institutional security and preserving internal order.' " *Ahlers v. Robinowitz,* 684 F.3d 53, 61 (2d Cir.2012) (quoting *Bell v. Wolfish,* 441 U.S. 520, 546 (1979)). It is true that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22. As the Second Circuit has noted, "[h]owever, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." *Ahlers,* 684 F.3d at 61. In determining whether a proper balance of those competing considerations has been struck, a court must afford the defendants' decisions a "presumption of correctness." *Id.* (quotation marks omitted).

In this instance, the interests of the state, cited by defendants as the genesis of the emergency bathroom and shower policies in May 2010, and the new, permanent policies that took effect in July of 2010, are compelling. According to Jeff Nowicki, the Chief of Mental Health Treatment Services for the SOTP at the CNYPC, the modification of policies was motivated by security concerns, including concerns about residents fighting, engaging in both involuntary and voluntary sexual activity, and trafficking of contraband inside the bathrooms and showers. These are legitimate security concerns that can justify the implementation of policies placing restrictions upon the use of bathroom and shower facilities within the Center. *See Bell,* 441 U.S. at 553 (finding a prison facility's policy prohibiting inmates from receiving packages from outside the facility containing food items or personal property justifiable based on evidence that the introduction of such packages would require an inordinate amount of time to inspect, increase the risk of inmate conflicts, and introduce a storage and sanitation problem into the facility); *accord, Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1516 (2012) ("Policies designed to keep contraband out of jails and prisons have been upheld in cases decided since *Bell.*" ).

**\*11** Balanced against these legitimate concerns is the relatively modest imposition upon the plaintiffs. Plaintiffs do not allege that they are denied the right to shower daily resulting from the revised policies. Instead, they complain that the requirement to sign up for an available time slot to shower some how violates their constitutional rights. Similarly, while plaintiffs do not contend that they are deprived of the opportunity to utilize a bathroom, they suggest that, on the occasions that they are required to wait as long as five or ten minutes, their rights are violated. [7] These contentions, however, are not unsupported by any applicable legal authority. *See Odom v. Keane,* No. 95–CV–9941, 1997 WL 576088, at *5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (finding that the plaintiff's conditions of confinement claim was legally deficient where there was evidence that his "toilet functioned approximately twelve hours every day, time enough to dispose of [his] bodily wastes"); *accord, McGee v. Pallito,* No. 10–CV–0011, 2011 WL 6291954, at *6 (D.Vt. Aug. 3, 2011). The constitution requires only "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination[.]" *Whitnack v. Douglas Cnty.,* 16 F.3d 954, 958 (8th Cir.1994). Having reviewed the record, I find that no reasonable factfinder could conclude that the CNYPC's bathroom and shower policies deprive the plaintiffs of the minimal civilized measure of life's necessities. [8] Accordingly, I recommend that plaintiffs' Fourteenth Amendment due process claim be dismissed.

C. *Section 504 of the Rehabilitation Act*
Plaintiffs also assert a claim under the section 504 of the Rehabilitation Act. Complaint (Dkt. No. 1) at 30–31. In their motion, defendants request dismissal of this claim, arguing that plaintiffs' complaint fails to state a claim upon which relief may be granted, and the individual defendants are immune from suit under the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 27–3) at 14–18.

1. *Failure to State a Claim Upon Which Relief May Be Granted*
Because a court "may dismiss for failure to state a cause of action upon motion for summary judgment," it is necessary to set forth the legal standard governing Rule 12(b)(6). *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *see also Katz v. Molic,* 128 F.R.D. 35, 39 (S.D.N.Y.1989) ("Therefore, that a summary judgment motion is being treated as a motion to dismiss for failure to state a claim does not require notice to the parties.").

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677–78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

**\*12** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly,* 550 U.S. at 555–56); *see also Cooper v. Pate,* 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182

(N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

Turning to the legal authority governing plaintiffs' claims under the Rehabilitation Act, section 504 mandates that a person with a qualified disability may not be excluded from participation in, denied the benefits of, or otherwise discriminated against in connection with any program or activity receiving federal financial assistance.[9] 29 U.S.C. § 794; *see Bryant v. New York State Educ. Dep't,* 692 F.3d 202, 216 (2d Cir.2012). Pursuant to section 504, "reasonable accommodations must be offered to ensure meaningful access to the [federally funded] program, [but] the statutes do not require that substantial changes be made to the program itself." *Zahran ex rel. Zahran v. New York Dep't of Educ.,* 306 F.Supp.2d 204, 213 (N.D.N.Y.2004) (Hurd, J.) (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 70 (2d Cir.2000)). To

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

state a claim under section 504, a plaintiff's complaint must set forth allegations that plausibly suggest that (1) he is a person with a disability as defined under the Rehabilitation Act, (2) he has been denied the benefits of or excluded from participating in a federally funded program or special service, and (3) he was denied access based solely on his disability. *Bryant,* 692 F.3d at 216.

**\*13** In this case, plaintiffs' section 504 claim arises from allegations that they have received inadequate vocational training while confined at the CNYPC. More specifically, they allege that they each meet the definition of "disabled" as it is defined in the Rehabilitation Act because they have "been diagnosed with a mental disability within the meaning of 29 U.S.C. § 705." Complaint (Dkt. No. 1) at 31. Plaintiffs' complaint also alleges that CNYPC residents "have the right to vocational training services[ ] that will enable them to live as independently as possible[, but that] ... Defendants exploit [residents] for their labor[ ] by instituting workprograms that generates profits[,]" *Id.* at ¶ 6. Finally, it is alleged that "[t]he violations of Plaintiffs' rights by Defendants include, but not limited to the failure of the CNYPC–SOTP to provide Plaintiffs with adequate and appropriate vocational training services, that benefits other recipients of public programs and services." *Id.* Accordingly, although this is far from clear, I have construed plaintiffs' Rehabilitation Act claim to encompass two components. First, they complain of being exploited by the alleged requirement that they work in programs for the sole purpose of generating profits for the CNYPC. The second aspect of the Rehabilitation Act claim challenges defendants' failure to provide adequate rehabilitative and vocational services.

The allegation that plaintiffs are forced to work while at the CNYPC is not cognizable under section 504. It fails to plausibly suggest that they are denied access to the work program (assuming, without deciding, that it constitutes a federally funded program) based on a disability. Instead, it is alleged that defendants *force* plaintiffs to participate in the work program for the benefit of the CNYPC, which is antithetical to a section 504 claim. [10] Accordingly, I find that this allegation is insufficient to support a cognizable section 504 claim.

Plaintiffs' second basis for asserting a claim under the Rehabilitation Act fails for similar reasons. Assuming (without deciding) that plaintiffs satisfy the definition of disability under the Rehabilitation Act, none of the

complaint's allegations plausibly suggest how defendants denied them access to the work program, or that they were denied access based on their disability. Moreover, the allegation that "others" receive benefits that plaintiffs are denied due to their alleged disability is conclusory and unsupported by any other allegations in the pleading. More specifically, plaintiffs fail to identify who the "others" are, or what benefits they receive that plaintiffs are denied. Accordingly, I find that these allegations are also insufficient to support a cognizable section 504 claim, and recommend that the claim be dismissed.

### 2. *Eleventh Amendment Immunity*

Because I find that plaintiff's section 504 claim fails to state a claim upon which relief may be granted, I will not address defendants' Eleventh Amendment immunity arguments.

### D. *Equal Protection*

**\*14** Liberally construed, plaintiffs' fourth claim for relief includes an equal protection claim arising under the Fourteenth Amendment. Complaint (Dkt. No. 1) at 31. While defendants have not challenged this cause of action, the court may, *sua sponte,* determine whether a plausible equal protection claim has been stated in light of plaintiffs' IFP status. *See* 28 U.S.C. § 1915(e) ("[T]he court shall dismiss the case at any time if [it] determines that ... the action ... fails to state a claim on which relief may be granted[.]").

The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a cognizable equal protection cause of action, a plaintiff must allege sufficient facts that plausibly suggest that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995).

In this instance, plaintiffs compare themselves to convicted state prisoners, and allege that state prisoners experience more favorable conditions than CNYPC residents. Complaint (Dkt. No. 1) at 31. Even assuming (without deciding) that the two groups—CNYPC residents that are civilly confined, and prison inmates penally confined—are similarly situated for purposes of

an equal protection analysis, plaintiffs' complaint fails to allege facts that plausibly suggest any disparity in the conditions experienced by the two groups as a result of purposeful discrimination directed at an identifiable suspect class. *See Taylor v. New York State Dep't of Corr. Servs.,* No. 07–CV–1288, 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2001) (Mordue, J.) ("[S]ex offenders do not comprise a suspect or quasi-suspect class for equal protection purposes [.]"). Under a Rule 12(b)(6) analysis, it is not enough to conclusorily allege that plaintiffs experience housing conditions that are "substantially inferior" to those of a state prisoner. Complaint (Dkt. No. 1) at 31. Such an allegation, on its own, does not provide defendants with adequate notice as to what conditions plaintiffs complain of, or how state prisoners experience more favorable conditions. Accordingly, I recommend that plaintiffs' equal protection claim be dismissed.

### E. *Supplemental Jurisdiction*

In the event this report is adopted, all of plaintiffs' federal cause of actions will be dismissed, and all that will remain are the claims asserted under the New York State Constitution and state law. Under those circumstances, I would recommend that the court decline to exercise supplemental jurisdiction over the remaining state claims, pursuant to 28 U.S.C. § 1367. *Stephenson v. Albany Cnty. Policymakers,* No. 09–CV–0326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

### IV. *SUMMARY AND RECOMMENDATION*

**\*15** At the heart of plaintiffs' claims in this action is their challenge to new policies adopted at the CNYPC for those receiving sex offender treatment, governing the use of facility bathrooms and showers. Because the policies were implemented due to legitimate security concerns of facility staff and residents, and result in only minimal inconvenience to plaintiffs, I recommend dismissal of plaintiff's constitutional challenge to those policies.

Plaintiffs' complaint also asserts a claim of disability discrimination under section 504 of the Rehabilitation Act, based upon defendants' alleged failure to provide proper vocational and other training to the plaintiffs. The Rehabilitation Act, however, does not affirmatively mandate that programs be provided to the disabled but instead merely prohibits the denial of participation in programs and receipt of benefits based upon disability. Since plaintiffs have failed to identify any programs of which they have been denied based upon their alleged disability, their Rehabilitation Act claims are also subject to dismissal.

Plaintiffs' complaint, liberally construed, also asserts an equal protection claim against defendants. That claim, however, is subject to dismissal because plaintiffs have failed to allege facts plausibly suggesting that they have been treated differently than other, similarly situated individuals based upon intentional or purposeful discrimination directed toward an identifiable or suspect class. Based upon the foregoing, and my recommendation that the court not exercise supplemental jurisdiction over the remaining state law and state constitutional claims, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 27) be GRANTED, and that plaintiffs' complaint in this action be DISMISSED in its entirety, without prejudice to their right to commence an action in a state court of competent jurisdiction.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 6169746

---

Footnotes

1   At the outset, it should be noted that, although plaintiffs bring their claims concerning their conditions of confinement under the Eighth Amendment, their claims arise under the Fourteenth Amendment because they are involuntarily committed

residents of a state institution. *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982) (holding that respondent, who was involuntarily committed to a state institution, had constitutionally protected liberty interests under the due process clause of the Fourteenth Amendment).

2    The Clerk is directed to link the R & R to this decision; familiarity therewith is presumed.

3    "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149049, at *6.

4    Fourteenth Amendment claims challenging the conditions of involuntary confinement have been analyzed in a manner similar to Eighth Amendment claims, under which the plaintiff must establish that the conditions are sufficiently serious, from an objective point of view, and that the official acted with "deliberate indifference." *Dove v. City of N.Y.,* No. 03–CV–5052, 2007 WL 805786, at *7–8 (E.D.N.Y. Mar. 15, 2007). Some courts, however, have applied a more narrow subjective standard, particularly against defendants who are "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice, or standards." *Vallen v. Carrol,* No. 02–civ–5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept. 20, 2005) (quoting *Youngberg,* 457 U.S. at 323). The court, however, agrees with Judge Peebles that no reasonable factfinder could conclude that the bathroom and shower policies violate the Constitution under either standard, and it therefore is unnecessary to determine which standard should apply. (R & R at 16 n. 6.)

5    To the extent that these claims arise under New York State law, the court agrees with Judge Peebles and, after having disposed of all of the federal claims, declines to exercise supplemental jurisdiction over the remaining state law claims. (R & R at 28.)

1    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    Under New York law, a "dangerous sex offender requiring confinement" is defined as a "detained sex offender suffering from a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility." N.Y. MHL § 10.03(e). The MHL does not allow for indefinite confinement of a detained sex offender. Instead, the commissioner of the OMH is required to provide a civilly committed sex offender and his counsel with annual notice of the right to petition the court for discharge, and must assure that each person so confined receives an examination for evaluation of his mental condition at least once a year, calculated from the date on which the court last ordered or confirmed the need for civil confinement. N.Y. MHL § 10.09(a)-(b). The law also includes a provision for annual court review in the form of an evidentiary hearing to determine the necessity of continued retention. N.Y. MHL § 10.09(d).

3    None of the plaintiffs reside in the MAPSS unit. Nowicki Decl. (Dkt. No. 27–4) at ¶ 16.

4    Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the answering of a plaintiff's complaint. *Compare* Fed.R.Civ.P. 12(b)(6) *with* Fed.R.Civ.P. 56. In light of the fact that, by moving for summary judgment, defendants are actively defending against plaintiff's claims, and in order to avoid any argument that they have defaulted, in my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until twenty-one days after a final determination is reached with respect to defendants' motion, in the event that the action survives. *Snyder v. Goord,* No. 05–CV–1284, 2007 WL 957530, at *5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M. J.).

5    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

6    Applying the reasoning embodied in the Supreme Court's decision in *Youngberg,* some courts have applied a more narrow subjective standard, particularly against defendants who could be characterized as "professionals," under which liability would attach only to conduct that constituted a "substantial departure from accepted professional judgment, practice or standard" as distinct from the broader "deliberate indifference" standard. *Youngberg,* 457 U.S. at 323; *see Dove,* 2007 WL 805786, at *7–8; *Vallen v. Carrol,* No. 02–CV–5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept. 20, 2005). Like the courts in *Dove* and *Vallen,* however, I find it unnecessary to determine which of these standards of review should apply in the current action because I find that no reasonable factfinder could conclude that the policies challenged by plaintiffs in their complaint run afoul of the constitution under either.

7    The policy currently in place permits more than one CNYPC resident to utilize residential bathroom facilities, under supervision by an SCTA, between the hours of 7:00 a.m. and 11:00 p.m. In addition, the policy allows for accommodations for those residents with medical issues requiring more frequent bathroom breaks.

8    Additionally, although not dispositive of the inquiry, the CNYPC's resident bathroom policy was reviewed by the New York State Commission on Quality Care and Advocacy for Persons with Disabilities ("CQCAPD"), on request from the New

York State Inspector General, and found it to be acceptable. Nowicki Decl. (Dkt. No. 27–4) at ¶ 27; Nowicki Decl. Exh. E (Dkt. No. 27–10). Based upon that review, the CQCAPD concluded that the CNYPC

> has a rationale [sic] and defensible argument for the creation of [the policy,] ... which individuals identified by the treatment team as needing increased monitoring, will have a physician's order that they must enter one at a time to the bathroom on the treatment mall and/or the activity center. [Another of the CNYPC policies, entitled] Sex Offender Treatment Program Resident Rights[,] indicates that the patient rights includes that basic human needs will be met and residents' personal privacy is protected within the necessary constraints dictated by the need for safety and security. Nowicki Decl. Exh. E (Dkt. No. 27–10) at 1.

9   Specifically, section 504 provides, in relevant part, that

> [n]o otherwise qualified individual with a disability ... solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

> 29 U.S.C. § 794(a).

10   Plaintiffs' submissions in opposition to the pending motion could be regarded as asserting a retaliation claim, based upon their removal from the facility's work program following commencement of this suit. Because it is clear that the defendants were dropped based upon their complaints of being subjected to forced labor, and that plaintiffs can request re-entry into the program at any time on a voluntary basis, it would be disingenuous for them to argue that adverse action has been taken against them, as required for a retaliation claim.

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at [*]1 n. 1 (N.D. N.Y.1998); *Costello v. Norton,* 1998 WL 743710, at [*]1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at [*]1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See,e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Daves v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio)
("[c]omplaints concerning unfair treatment in general
which do not specifically address discrimination are
insufficient to constitute protected activity"), *aff'd,* 194
F.3d 1315 (6th Cir.1999).

> **FN8.** As properly noted by defendant, *see* Def.
> Mem. of Law at 28 n. 14, plaintiff's complaint
> alleges that a number of individuals retaliated
> against her, but in her deposition she essentially
> conceded that she has no basis for making a
> claim against anyone other than Roopnarine and
> those who graded her third exam. *See* Pl.'s Dep.
> at 347-53.

The undisputed evidence establishes that Roopnarine had
no role in the selection of who would grade plaintiff's
exam. Nor, for that matter, did he grade the exam; this was
done by three other professors. Each of these professors
has averred that they graded the exam without any input or
influence from Roopnarine. More importantly, it is
undisputed that none of the three had any knowledge that
a sexual harassment complaint had been asserted by
plaintiff against Roopnarine, not surprising since two of
the three did not even know whose exam they were
grading. Plaintiff's inability to show that her failure was
causally related in any way to her complaint of harassment
is fatal to her retaliation claim.[FN9]

> **FN9.** Plaintiff's claim also fails to the extent that
> the school's refusal to let her take the research
> methods exam for a fourth time was the
> retaliatory act she relies upon. It is undisputed
> that the University's policies for CFS department
> students only allow a comp. exam to be given
> three times. *See* Gaal Aff. Ex. 53. Plaintiff
> cannot claim that the University's refusal to
> depart from its own policies was retaliation
> without some concrete showing that its refusal to
> do so was out of the ordinary, i.e., that it had
> allowed other students to take the exam a fourth
> time without a remedial course, when these other
> students had not engaged in some protected
> activity. *See* *Murray,* 57 F.3d at 251 (there is "no
> allegation either that NYU selectively enforced
> its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these
standards.").

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's
motion for summary judgment is GRANTED; plaintiff's
claims of hostile environment and retaliation are
DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

**\*1** Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. Id. Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))


N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

### INTRODUCTION

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.),* *af'd without op.,* 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995)* (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [FN1]

> [FN1.] Local Rule 7.1(a)(3) provides:
>
> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

> FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. See _Langman Fabrics v. Graff Californiawear, Inc.,_ 160 F.3d 106, 112–13 (2d Cir.1998); _see also Cruz v. Church,_ 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in _Jeffreys_ who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the _Jeffreys_ exception. See _Percinthe v. Julien,_ 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the _Jeffreys_ exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries [sic] pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

### CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.